888 So.2d 532 (2003)
Walter Leroy MOODY, Jr.
v.
STATE of Alabama.
CR-96-0994.
Court of Criminal Appeals of Alabama.
April 18, 2003.
Rehearing Denied September 12, 2003.
*540 Bruce A. Gardner, Huntsville, for appellant.
William H. Pryor, Jr., atty. gen., and Jeremy W. Armstrong, James R. Houts, and Regina F. Speagle, asst. attys. gen., for appellee.
PER CURIAM.
The appellant, Walter Leroy Moody, Jr., was convicted of two counts of capital murder in connection with the December 1989 pipe-bomb murder of Judge Robert S. Vance of the United States Court of Appeals for the Eleventh Circuit. The murder was made capital because it was committed by means of explosives or explosion, see § 13A-5-40(a)(9), Ala.Code 1975, and because Judge Vance was a federal public official and the murder was related to his official position, see § 13A-5-40(a)(11), Ala.Code 1975. Moody was also convicted of assault in the first degree for the serious injuries that Helen Vance, Judge Vance's wife, sustained as a result of the bomb blast, see § 13A-6-20(a)(1), Ala.Code 1975. The jury, by a vote of 11-1, recommended that Moody be sentenced to death for his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced Moody to death. The trial court also sentenced Moody, as a habitual felony offender, to life imprisonment for the first-degree-assault conviction. This appeal followed.

I.
Moody does not challenge the sufficiency of the evidence to support his convictions. However, we have reviewed the evidence, and we find that it is sufficient to support Moody's convictions. We summarize the relevant facts.
Around the second week of December 1989, four pipe bombs were sent through the United States mails to different locations in the southeastern United States. On December 16, 1989, the package containing one of those pipe bombs was delivered to the Mountain Brook, Alabama, residence of Judge Vance. The package was addressed to Judge Vance and showed the name and Newnan, Georgia, address of one of his judicial colleagues as the return addressee. When Judge Vance opened the package, the bomb inside detonated, killing him almost instantly. Judge Vance's wife, Helen Vance, was seriously injured by the blast. The pipe bomb was constructed of a steel pipe approximately five and one-half inches in length and one and one-half inches in diameter, sealed at each end with threaded end caps; it contained smokeless gunpowder and a homemade detonator fashioned from the hollowed-out barrel of a ballpoint pen. The device was designed to explode when the lid of the box in which it was contained was opened. Numerous nails had been secured to the pipe with rubber bands; the nails served as projectiles upon detonation.
Two days later, on December 18, 1989, Robert Robinson, a civil rights attorney in Savannah, Georgia, was killed after opening a package containing a similar pipe bomb, which had been delivered to Robinson's Savannah law office. That same day, a third pipe bomb was received at the courthouse of the United States Court of Appeals for the Eleventh Circuit in Atlanta, Georgia. A court security officer using an X-ray machine discovered the device, which was disarmed by bomb-squad technicians before it could detonate. The following day, on December 19, 1989, a fourth pipe bomb was received  this one at the *541 Jacksonville, Florida, office of the National Association for the Advancement of Colored People ("NAACP"); the bomb was discovered and disarmed before it could injure anyone.[1]
Testimony presented at Moody's trial indicated that the four pipe bombs were very similar in construction and design. All of the bombs had been placed in reinforced cardboard boxes that had been painted inside with black latex paint. All were delivered in packages wrapped in brown paper, tied with string, wrapped with the same kind of tape, posted with the same kind of priority mail stamps, and addressed with the same kind of mailing labels. The addresses on all the mailing labels appeared to have been typed with the same typewriter. All of the bombs were constructed of steel pipes filled with Hercules Red Dot brand smokeless gunpowder. While the pipe that made up the bomb that killed Judge Vance was sealed at both ends with end caps that had been screwed into place, the ends of the other three bombs had been sealed with welded end plates that were joined by a steel rod extending through the center of each pipe. The steel rods were secured at the ends by hexagonal nuts. Nails had been attached, by rubber bands, to the outside of each pipe, and each bomb had the same kind of triggering mechanism and detonator. All of the bombs used C-cell batteries as their electrical source, and all had the same type of modified battery holder in them. Typed notes threatening death were contained inside the boxes in which three of the four bombs had been sent. (Only the bomb sent to the federal courthouse in Atlanta was not accompanied by such a note.) There were numerous other similarities in the details of the bombs' composition, in the construction of the boxes that held the bombs, and in the packaging of the devices.[2] Based on the many similarities, forensic investigators believed that all four bombs were made and sent by the same person.
In the days that followed the killings of Judge Vance and Robert Robinson, every judge on the Eleventh Circuit Court of Appeals received typed letters in which the sender took credit for the bombings and threatened the recipients with assassination, "because of the federal courts' calloused [sic] disregard for the administration of justice," in the name of an organization known as "Americans for a Competent Federal Judicial System." Similar death-threat letters were received at the Atlanta and Jacksonville offices of the NAACP. A separate typed death-threat letter, addressed to news anchorwoman Brenda Wood, was received at the WAGA television station in Atlanta.
The death-threat letters were all signed "010187" and specified that the writer was using this number as a secret code and that it was not to be disclosed to the public. All of the letters were postmarked from Atlanta and were posted with a 25-cent American-Flag-Over-Yosemite stamp. The packages containing three of the four pipe bombs were posted with the *542 same kind of American-Flag-Over-Yosemite stamp. An analyst for the Federal Bureau of Investigation ("FBI") concluded that the letters received by the judges on the Eleventh Circuit Court of Appeals and at the Atlanta and Jacksonville offices of the NAACP had all been prepared with the same manual typewriter used to type the addresses on the mailing labels affixed to all four of the pipe-bomb packages. The letter addressed to Brenda Wood had been prepared with a different typewriter.
Testimony revealed that on August 21, 1989, about four months before the murder of Judge Vance, the NAACP regional office in Atlanta had received through the mail a tear-gas bomb, the triggering mechanism and packaging of which were similar in numerous respects to the four pipe bombs mailed in December 1989. The tear-gas bomb exploded when an NAACP employee opened the box in which it was packaged, filling the office with tear gas. Like three of the four December 1989 pipe bombs, the tear-gas bomb was accompanied by a typed death-threat note. The package containing the tear-gas bomb bore a false return address from Atlanta.
In the days following the receipt of the tear-gas bomb at the NAACP office, various news media outlets throughout the eastern United States received copies of a typed letter in which the anonymous sender complained about the Eleventh Circuit Court of Appeals'"callous disregard for justice"; in the letter, the sender issued a "Declaration of War" and threatened nerve-gas attacks against "densely populated cities." All of the letters were posted with a 25-cent American-Flag-Over-Yosemite stamp.[3] It was determined that the letters had been prepared with the same manual typewriter used to type the address on the mailing label affixed to the package containing the tear-gas bomb.
The State presented evidence indicating that the August 1989 tear-gas bomb and the four December 1989 pipe bombs  including the one that killed Judge Vance  were all constructed and sent by the appellant, Walter Leroy Moody, Jr., as part of Moody's declared "war" on the court system. That war stemmed from Moody's conviction in federal court, almost 17 years earlier, on charges of possessing a pipe bomb. In May 1972, a pipe bomb had exploded in Moody's residence in Macon, Georgia. That bomb, which had been contained inside a package addressed to an automobile dealer who had repossessed Moody's car, had exploded when opened by Moody's then wife, seriously injuring her. Moody had been arrested and charged with the manufacture and possession of a pipe bomb. During his 1972 trial on those charges in federal court, Moody had taken the stand in his own defense and maintained that a man named "Gene Wallace"[4] had secretly planted the bomb in Moody's home, allegedly to harm Moody. The jury had found Moody guilty of possessing a pipe bomb, although it had acquitted him of the charge of manufacturing it. Moody served three years in the federal penitentiary for the conviction.
After he was released from prison, Moody became obsessed with overturning his conviction, believing that it had tarnished his good name and that it stood in the way of his aspirations of becoming a lawyer. Several years before he went to prison, Moody had attended law school without finishing, and in the mid 1980s he *543 inquired into resuming those studies; however, he learned that a felony conviction would disqualify him from practicing law in Georgia. In addition to seeing his conviction as standing between him and a legal career, Moody had convinced himself that he had been unfairly convicted  that he was the victim of an immense conspiracy involving, in his mind, corrupt law-enforcement officers, the trial judge, the prosecutor, and even his own appointed counsel. Moody's sense of aggrieved victimization fueled what was to become his long-running and continuing quarrel with the legal system  particularly with the federal courts in the Eleventh Circuit.
Sometime in 1985, Moody devised a scheme to get his conviction overturned, by bribing an acquaintance, Julie Linn-West, to give perjured testimony substantiating Moody's claim that the fictional "Gene Wallace" had placed the pipe bomb in Moody's home in Macon in 1972. Moody provided Linn-West  a young, destitute, wheelchair-bound woman  with a detailed scripted story shifting the blame to Gene Wallace. Moody paid Linn-West in small monthly installments as she learned Moody's written script, according to which Linn-West was to claim that she had been with Gene Wallace in Macon in 1972 and had seen him place the bomb in Moody's home. According to the script, Linn-West was also to maintain that she feared Gene Wallace would harm her if she had implicated him, but that, after experiencing pangs of conscience, she had finally come forward to help Moody clear his name.[5]
In September 1986, when he was satisfied that Linn-West had learned his scripted story, Moody filed a petition for a writ of error coram nobis in the federal district court in Macon, asking the court to vacate his 1972 conviction based on "newly discovered evidence," i.e., the fabricated story placing the blame for the bombing on Gene Wallace. Linn-West's mother, Jo Ann Ekstrom, subsequently became involved in Moody's scheme, and she, too, agreed to give false testimony on his behalf. Following a hearing, in March 1988, at which Linn-West and Ekstrom perjured themselves by reciting Moody's scripted story, the district court denied Moody's petition. Moody appealed to the Eleventh Circuit Court of Appeals, which affirmed the denial in June 1989.[6] This final rejection precipitated Moody's war on the courts. It was the State's theory at trial that Moody became disillusioned with lawyers, judges, and other representatives of the legal system as a result of his contacts with that system and that his inability to convince the courts that he had been wronged by the system led to the series of bombings that resulted in the death of Judge Vance.
The evidence revealed that in the summer of 1989, Moody enlisted the help of his girlfriend, who later became his wife, Susan McBride Samford, to procure items necessary for him to construct explosive devices to use against the court and others. Moody initially dispatched Samford on trips around the Southeast to gather the components for a "chemical project" he was allegedly working on. In July 1989, however, Moody abandoned this chemical project. He then started the project that ultimately produced the tear-gas bomb that exploded at the NAACP regional office *544 in Atlanta in August 1989. After the tear-gas bombing, Moody pursued another project, again using Samford to procure the necessary components for him, sending her on numerous surreptitious missions to hardware and supply stores, where Samford made purchases or shoplifted items, as instructed by Moody. During this time, Moody sealed off the front bedroom of the Rex, Georgia, residence he shared with Samford and gave her lists of items to procure. With these items, Moody then constructed four pipe bombs, including the pipe bombs that killed Robert Robinson and Judge Vance.
At Moody's trial, Samford testified at length about her activities in gathering the components Moody used to make the pipe bombs and the packages in which they were sent.[7] Among the items Samford stated she procured for Moody were mailing labels of the same type used in the December 1989 pipe bombs; stamps like those on the packages containing the December 1989 pipe bombs; cardboard boxes like those used to hold the December 1989 pipe bombs; aluminum pie pans made of material similar to the material found in the December 1989 pipe bombs; goose-pattern paper towels like those used in the December 1989 pipe bombs; C-cell batteries like those used in the December 1989 pipe bombs; flashlight bulbs like those used in the December 1989 pipe bombs; black latex paint like that used to paint the boxes that held the December 1989 pipe bombs; nails like those used in the December 1989 pipe bombs; string like that used in the December 1989 pipe bombs; brown wrapping paper like that used in packaging the December 1989 pipe bombs; aluminum clothesline wire like the heavy-gauge aluminum wire used in the December 1989 pipe bombs; rubber bands like those used in the December 1989 pipe bombs; and tape like that used in packaging the December 1989 pipe bombs.
Samford's testimony indicated that, after Moody finished his construction of the pipe bombs in early December 1989, he opened the bedroom in which he had been working and then thoroughly cleaned and remodeled the bedroom in order to erase evidence of his bomb making. He then mailed the bombs. According to Samford, after the FBI began investigating Moody's involvement in the December 1989 bombings, Moody remarked to her, "[I]f they have any evidence, it would be DNA." (Vol.68, R. 1191.) On another occasion, in late December 1989, after seeing a television news report that a judge in Maryland had been injured by a pipe bomb, Moody told Samford something to the effect of "That one is not mine" or "I didn't do that one." (Vol.68, R. 1188.)
In addition to the incriminating testimony against Moody presented by Samford, there was eyewitness testimony indicating that on December 2, 1989, at a gun shop in Griffin, Georgia, Moody purchased four pounds of Hercules Red Dot brand smokeless gunpowder and an unusually large number of CCI brand pistol primers  the kind of gunpowder and primer material that, according to forensic analysis, was *545 used in the December 1989 pipe bombs. The State's experts testified that there were numerous similarities between the pipe bomb that exploded in Moody's home in 1972 and the four December 1989 pipe bombs and that the bombs contained the "signature" of the same maker  indicating that they had all been made by the same person. The evidence also showed that the 1972 pipe bomb  like three of the four December 1989 pipe bombs and like the August 1989 tear-gas bomb  had been accompanied by a threatening note.[8]
The State also presented evidence showing that in February 1990, federal investigators recovered a steel pipe with threaded end caps during a search of a storage area that Moody was renting in Chamblee, Georgia. This device was similar in some respects to the 1972 pipe bomb and the December 1989 pipe bombs, and a forensic explosives expert testified that the device appeared to represent a transitional phase between the 1972 pipe bomb and the December 1989 pipe bombs.
Karlene Shiver, a woman who had dated Moody in the early 1980s, testified that Moody owned a manual typewriter on which the letter "A" would "jump." The State presented evidence demonstrating that each "A" appearing in a word on a typed death-threat letter from "Americans for a Competent Federal Judicial System" that was sent to Brenda Wood at the WAGA television station in Atlanta shortly after the pipe-bomb killings jumped above the other letters in the word. Shiver also testified that Moody had once told her that a bombing was a "perfect crime" because when everything exploded, there was nothing left to investigate. (Vol.72, R. 405.)
During their investigation of the bombings, federal agents electronically monitored Moody's residence and the jail cell in which he was held after his arrest. The surveillance yielded several audiotapes on which Moody was heard whispering incriminating statements to himself. In one such "conversation," Moody stated, "Now you've killed two.... Now you can't pull another bombin'...." In another statement that he whispered to himself, Moody complained that the courts were crooks and that he had been the victim of a "judicial raping." Moody then stated, "I'll guarantee you, it will never happen again. Now you, you don't believe me? You're in for a rude awakening!"
In November 1990, Moody was charged with numerous federal crimes related to the bombings. The venue for the trial on those charges was changed to St. Paul, Minnesota. After a trial in June 1991, a jury found Moody guilty on 71 separate counts. Moody was sentenced to 7 life terms plus 400 years in the federal penitentiary.
In December 1991, a Jefferson County grand jury indicted Moody on the charges that are the subject of this appeal: two counts of capital murder arising out of the death of Judge Vance and one count of assault in the first degree arising out of the injuries sustained by Helen Vance. Following numerous delays, Moody's trial began in October 1996.[9] After a four-week *546 trial, the jury found Moody guilty of all charges.
Moody raises several issues on appeal that he did not raise at trial. Because Moody was sentenced to death, his failure to object at trial does not bar our review of these issues, see Rule 45A, Ala. R.App. P.; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343, 351-52 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992); Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court has recognized that "`[t]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)), aff'd, 651 So.2d 659 (Ala.1994).

II.
Moody contends that the trial court erred in refusing to grant him a continuance to obtain an attorney, requested by Moody after the voir dire examination of the prospective jurors had begun. (Issue II in Moody's brief.)
We begin our analysis of this issue by recounting the events that culminated in Moody's proceeding through his trial without the aid of a lawyer. As previously stated, a Jefferson County grand jury indicted Moody in December 1991. In February 1992, upon finding that Moody was indigent, the trial court appointed attorney L. Dan Turberville to represent him. The following month, the trial court appointed attorney Richard S. Jaffe to assist Turberville. Both Turberville and Jaffe are seasoned criminal defense attorneys with abundant prior experience representing defendants in capital-murder cases.
For more than two years after they were appointed, during which time Moody's case was continued several times, Turberville and Jaffe actively represented Moody, filing numerous motions, appearing at numerous hearings, conducting discovery, and engaging in extensive pretrial preparation on Moody's behalf. Moody, however, was dissatisfied with his attorneys, and he began sending letters to the trial court complaining about their performance and seeking to have them removed *547 as his counsel.[10] He also filed a motion for an "independent counsel" who would report on the adequacy of the representation he was receiving from Turberville and Jaffe. Moody would eventually sue the attorneys in federal court, alleging that they were providing him ineffective assistance.
Quite aware of Moody's dissatisfaction, Turberville and Jaffe, on June 7, 1994, moved to be allowed to withdraw from further representation of Moody based on "irreconcilable differences." In moving to withdraw as counsel, Turberville and Jaffe informed the trial court that their relationship with Moody had broken down entirely, that Moody "refuses to communicate with counsel unless counsel does exactly what the client says," that Moody "has claimed that both of his counsel are ineffective and inadequate," and that Moody had made numerous threats against them. On June 22, 1994, the trial court set a hearing on the matter for July 26, 1994. The hearing was later reset for August 2, 1994. On July 25, 1994, Moody filed a motion with the trial court requesting that he be allowed to proceed pro se.
On August 2, 1994, the trial court held a hearing on Turberville and Jaffe's motions to withdraw as counsel as well as on Moody's motion to proceed pro se. At the hearing, an investigator for the Alabama attorney general's office testified concerning Moody's extensive litigation history and his often fractious relationships with the attorneys who had represented him in the many legal proceedings in which he had been involved. That testimony indicated that since 1972, Moody had been a party, whether at the trial level or appellate level, in a total of 63 legal proceedings  both civil and criminal. At some point in 47 of those proceedings, Moody either retained counsel or had counsel appointed to represent him, and in almost all 47 instances, he had discharged his attorneys, claiming that their representation was ineffective. As he had done with Turberville and Jaffe, Moody had also sued his attorneys in two of those cases. None of Moody's attorneys in the prior proceedings, however, had ever been found to be ineffective. In approximately 35 of the prior legal proceedings, Moody had proceeded pro se for either all or part of a proceeding.
After determining that Moody had no objection, the trial court permitted Turberville and Jaffe to withdraw from further representation of Moody. Addressing Moody's motion to proceed pro se, the trial court then undertook a lengthy colloquy with Moody. It warned him that he would be at a significant disadvantage without counsel; that, as a nonlawyer, he would be "ill-equipped" to make arguments to the jury; and that the court considered his desire to represent himself to be "a foolhardy endeavor." The court urged Moody to accept counsel. The trial court fully advised Moody of the nature of the charges against him and the penalties that could be imposed if he were convicted. In addition, the trial court conducted an inquiry into Moody's background and legal experience and ascertained whether Moody was familiar with the order of a trial and the evidentiary rules. The trial court informed Moody that, if he proceeded pro se, he would be entitled to the assistance of standby counsel, but that that assistance would be limited to an advisory capacity and that standby counsel would not provide the thoroughgoing legal assistance full counsel could give. The trial *548 court also informed Moody that he had the right to withdraw his waiver of counsel at any time in the proceedings and to have experienced counsel appointed to represent him. However, the trial court expressly warned Moody that if he proceeded pro se but later changed his mind and accepted counsel, neither Moody nor his counsel would be entitled to delay the trial of his case. The trial court informed Moody that no continuance of the scheduled January 30, 1995, trial date would be granted because of his decision to proceed pro se.
During the hearing, Moody initially indicated that, while he wished to proceed pro se, he wanted the court to appoint a "cocounsel," who, according to Moody, would act as his "liaison" to the court, to the State, to any expert witnesses, and to "everybody else that is going to support the defense." (Vol. 56, hearing of August 2, 1994, R. 15.) When the trial court then advised Moody that it did not intend to allow Moody to participate as cocounsel or to proceed with a hybrid form of representation, Moody responded that the matter was "largely semantics" and that he did not care whether the attorney who assisted him was called cocounsel or assistant counsel or advisory counsel. (Vol. 56, hearing of August 2, 1994, R. 16.)
Throughout the hearing, Moody indicated that he understood the trial court's admonitions against proceeding pro se, and he plainly stated several times that he wanted to represent himself. Upon finding that Moody was fully aware of the consequences of self-representation, the trial court granted Moody's request to proceed pro se. The trial court also instructed Moody to provide the court with written notice whether he wanted standby counsel and, if so, in what capacity he expected standby counsel to serve. In a letter dated August 4, 1994, Moody informed the trial court that he did not want standby counsel and reaffirmed his desire to proceed pro se.
On August 13, 1994, Moody filed a motion with the trial court requesting that Jaffe be reappointed as his counsel. However, less than a week after making this request, Moody rescinded the motion to reappoint Jaffe, stating that his "past differences" with Jaffe had not been resolved. (Vol.11, C.2090.) The trial court subsequently entered an order expressly denying Moody's request to reappoint Jaffe, stating as grounds Moody's action then pending against Jaffe in federal court and Jaffe's previous statements that his differences with Moody were irreconcilable.
Moody's case was continued past the January 30, 1995, trial date and, for various reasons, including Moody's own dilatory conduct,[11] was continued several times thereafter. During the 16-month period that followed the August 2, 1994, hearing at which the trial court granted Moody's motion to proceed pro se, a number of additional hearings were held at which the issue of Moody's representation status was again discussed. At some of these hearings, Moody indicated to the trial court that he had been in contact with various attorneys who were "interested" in representing him, but that those attorneys had informed him that they were unable to take his case because they could not bear the financial burden of preparing for a capital-murder trial. Although the trial court pressed Moody to clarify his expectations regarding legal assistance, Moody refused to explain whether he had hoped one *549 of those "interested" attorneys would serve as his full counsel or in some sort of advisory capacity only. The trial court reminded Moody that should he desire to have counsel appointed  whether to serve as full counsel or in an advisory capacity  the court, and not Moody, would choose that attorney.[12]
At these and other pretrial hearings, Moody challenged the constitutionality of § 15-12-21, Ala.Code 1975, the Alabama statute authorizing the payment of attorney fees and other expenses incurred by counsel for an indigent defendant. Among Moody's contentions was that no competent counsel was willing to represent him under the "payment constraints" imposed by § 15-12-21(d) and that, in any event, he would not receive an adequate defense from any counsel who did represent him under such constraints. Consequently, he said, he was being "forced" to proceed pro se. This was to become a refrain of Moody's throughout the proceedings. At no time during the pretrial hearings, however, did Moody state that he wanted to withdraw his waiver of counsel. In fact, he several times reaffirmed his desire to represent himself.
When, during these hearings, the trial court revisited the specific question whether Moody wanted standby counsel, Moody was evasive, telling the court that his desire for standby counsel was contingent upon the amount of assistance such counsel would be allowed to provide him. The trial court informed Moody that standby counsel's function would be to ensure that Moody was familiar with the rules of procedure and with the trial process and to assist Moody with any points of law that might arise at trial, but that standby counsel would not be allowed to perform pretrial investigation or other extensive preparation of Moody's case. Moody expressed dissatisfaction with the limited function of standby counsel as delineated by the trial court; ultimately, he never asserted an unequivocal desire to have standby counsel appointed.
On May 7, 1996, the trial court held a hearing to again address matters related to Moody's representation.[13] At the outset of the hearing, the trial court announced that it had set Moody's trial date for October 7, 1996. The trial court then undertook a lengthy colloquy with Moody that was in all important respects a reiteration of the full colloquy that was undertaken at the hearing of August 2, 1994. The trial court again warned Moody of the significant disadvantages of proceeding without an attorney and advised him that it was in his best interests to accept the appointment of counsel. During the hearing, the trial court also reminded Moody that it was within the court's discretion to appoint standby counsel to assist him, and Moody stated that he did not want standby counsel. As it had done previously, the trial court informed Moody that he had the right to withdraw his waiver of counsel at any time in the proceedings and to have counsel appointed to represent him, but that if he did so, he would not be entitled to delay the trial. The trial court reemphasized *550 this point, warning Moody that "we are not going to delay the case by any manipulation of your rights to counsel." (Vol. 57, hearing of May 7, 1996, R. 30.) As he had done previously, Moody informed the trial court that he wanted to represent himself, and he proceeded to trial without the assistance of counsel.[14]
Voir dire examination of the prospective jurors began on October 7, 1996, and lasted for several days. Moody initially participated in the voir dire process. Toward the end of the first day of voir dire examination, Moody presented the trial court with a motion for a continuance, which indicated that David L. Lewis, an attorney licensed to practice in New York, was "interested" in accepting his case and that he wanted to be represented by Lewis. Moody did not attempt to explain why he had failed to bring this matter to the trial court's attention earlier. The trial court did not rule on Moody's continuance motion at that time. Voir dire examination was conducted only very briefly the following day, October 8, 1996, and did not resume until the morning of October 10, 1996. At the outset of the proceedings on October 10, Moody told the trial court that he was being represented in the case by Lewis and that the court and the State should address all further communications relating to the case to Lewis. Moody then provided the trial court with Lewis's address and telephone number in New York. After Moody objected "to this case being prosecuted without my attorney Mr. David L. Lewis being present to protect my rights," the following exchange occurred between the trial court and Moody:
"THE COURT: All right. Okay. Well, the Court has no record of Mr. Lewis filing any written appearance in this case, you know, as your attorney.
"The Court has explained to you on other occasions, as I think you have reflected and understood, that the Court would appoint you an attorney. And you have refused that in the past; is that correct?
"MR. MOODY: Yes, I have.
"THE COURT: All right. And you still feel that way?
"MR. MOODY: Yes, sir."
(Vol.59, R. 363-64.)
Voir dire examination of the prospective jurors was conducted for the remainder of the day. Toward the end of the day's proceedings and outside the presence of the prospective jurors, Douglas Culp, an attorney licensed to practice in Alabama, appeared specially on behalf of David L. Lewis and requested that Lewis be admitted to practice law in Alabama pro hac vice for the purpose of representing Moody. Moody was present in court with Culp[15] when this request was made. However, Lewis was not present. In conjunction with the pro hac vice request, Culp presented the trial court with a written motion for a continuance, which Lewis had drafted. In the motion, Lewis requested a 12- to 18-month continuance of Moody's case in order for him to prepare for trial. Lewis averred in the motion that this request was based on his review of allegedly exculpatory material contained in a memorandum authored by an FBI lab employee, Agent Frederic Whitehurst. In the memorandum, Whitehurst accused several of *551 his fellow agents and lab employees of withholding exculpatory evidence and manipulating their testimony in several high-profile criminal cases, including Moody's 1991 trial in Minnesota on federal charges related to the bombings. Lewis averred that he needed sufficient time to review the forensic evidence discussed in the Whitehurst memorandum and to review the proceedings from Moody's federal prosecution. In addition, Lewis averred that the complex factual and legal issues involved in a capital-murder case required considerable preparation by any attorney.
After Culp argued in support of the continuance motion, the following occurred:
"THE COURT: Let me state that I have reviewed this Whitehurst memorandum here. It is a document that was sent to Mr. Moody on August 16, 1995, by James S. Reynolds, Chief, Terrorism and Violent Crimes Section, Criminal Division....
"Now, after Mr. Moody has talked to you [Mr. Culp], do you have anything that you want to say 
"MR. CULP: No, I don't.
"THE COURT:  before Mr. Morrow [the prosecutor] responds?
"MR. CULP: No, sir.
"THE COURT: Mr. Morrow.
"MR. MORROW: Well, Judge, as I said, what's new? This is probably the fourth or fifth occasion that Mr. Moody has waited until the last second to say, `Oh, I've got somebody to represent me.'
"And is he representing him pro bono? Is he asking to be appointed? Has he been retained? We don't know his status. Besides that, is he qualified to come in and practice in this court? That would be a question.
"And we certainly oppose any continuance for any lawyer. This has been a typical and repeated performance. And I ask the Court to take judicial notice of the filing of Mr. Moody's litigation history with us, where he went through 40 some-odd attorneys. And his tactic has been, repeatedly, in his federal proceedings and in this proceeding, to wait until the last minute and say, `Oh, I've got a lawyer that wants to represent me, continue this case.' And it's been over and over and over and over again. This matter should not be continued.
"If Mr. Lewis wants to bring himself down here from New York and qualify himself with this Court and tell what status he's going to represent Mr. Moody in, bring him on. Let's get it going. But let's start it Tuesday morning like we're supposed to. Let's get this jury struck and let's go on. If we do it at Mr. Moody's schedule, it will be the day after forever."
(Vol.61, R. 666-68.) Culp offered no reason for Lewis's failure to request admission to represent Moody at an earlier time, other than to speculate that the fact the jury-selection process had begun in the case had "prompted people to get interested and to find an attorney that will represent him." (Vol.61, R. 669.) Nor did Moody endeavor to explain why he had waited until the eve of trial to reassert his right to counsel. After hearing additional argument from Culp, the trial court denied the request to admit Lewis pro hac vice and denied the motion for a continuance. In denying the continuance, the trial court indicated that it was taking judicial notice of the evidence concerning Moody's history of dilatory conduct and his dissatisfaction with the attorneys who had represented him in this and other cases.
Voir dire examination resumed the following morning, Friday, October 11, 1996, and concluded that day, just before the lunch recess. Following the lunch recess, *552 and outside the presence of the prospective jurors, Culp made another special appearance, this time to inform the trial court that John Matteson, an attorney in Atlanta, Georgia, had "expressed an interest" in assisting Lewis as counsel for Moody and "would be willing to come over here for a hearing, possibly the first of the week, on this issue." (Vol.62, R. 804-05.) As he had done with regard to Lewis the previous day, Culp requested that Matteson be admitted to practice law in Alabama pro hac vice for the purpose of representing Moody. Culp also moved to stay Moody's case. After hearing argument from Culp, the trial court denied the request to admit Matteson pro hac vice and denied the motion to stay the proceedings.
At that juncture, the trial court informed the parties that the time had come to strike the trial jury. After sua sponte excusing two prospective jurors, the trial court asked the parties if they wished to exercise any challenges for cause. When the State challenged one prospective juror for cause, the trial court asked Moody if he had an objection to the State's challenge. Moody responded by demanding "to be represented by attorneys Mr. John Matteson and David Lewis" and by requesting that the attorneys "be given time to prepare a case." (Vol.62, R. 808.) The trial court denied Moody's request. Thereafter, Moody refused to participate further in the selection of the jury, necessitating that the trial court exercise Moody's peremptory strikes for him during the striking process.[16] By the end of the proceedings on October 11, 1996, the trial jury was selected and empaneled.[17] The trial court informed the parties that the trial would start the following Tuesday, October 15, 1996, and then excused the jury for the afternoon.
When the court reconvened on the morning of October 15, attorney John Matteson appeared in person to request that he be admitted pro hac vice for the purpose of assisting David Lewis in representing Moody.[18] Matteson told the trial court that his request was expressly contingent on the trial court's also granting a lengthy continuance of the case to allow him time to prepare Moody's defense.[19] Matteson offered no reason for his failure to request admission to represent Moody at an earlier time. Nor did Moody. The trial court denied the request for a continuance, effectively also denying Matteson's pro hac vice request. The case was tried with Moody proceeding pro se and without standby counsel.
Moody refused to participate in the remainder of the trial proceedings. He refused to make an opening or closing statement,[20] did not cross-examine the State's *553 witnesses, and did not attempt to present a defense in either the guilt phase or the penalty phase of his trial. Throughout the trial, Moody made no objections except to repeatedly assert his demands that he be represented by Lewis and Matteson and that they be given time to prepare his case.
Moody argues that the trial court erred by refusing to grant him a continuance to secure the services of Lewis and Matteson as his attorneys.[21] Generally, a decision to grant or deny a continuance is reviewed for an abuse of discretion. Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986); see also, e.g., Ex parte Windsor, 683 So.2d 1042, 1047 (Ala.1996); Reynolds v. State, 539 So.2d 428, 429 (Ala.Crim.App.1988); Siniard v. State, 491 So.2d 1062, 1063 (Ala.Crim.App.1986). Where a defendant's Sixth Amendment right to counsel is implicated, courts have balanced several factors when considering the propriety of a continuance. See, e.g., Baker v. State, 683 So.2d 1, 5 (Ala.Crim.App.1995). Among those factors are the length of the continuance requested; the inconvenience to witnesses, counsel, and the court; whether other continuances have been granted; whether the defendant has other counsel prepared to try the case; whether the defendant was at fault; and "`whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived.'" See Baker, 683 So.2d at 5, quoting United States v. Burton, 584 F.2d 485, 491 (D.C.Cir.1978); see also Adkins v. State, 600 So.2d 1054, 1061 (Ala.Crim.App.1990), remanded, 600 So.2d 1067 (Ala.), remanded with directions, 600 So.2d 1072 (Ala.Crim.App.1992), on return to remand, 639 So.2d 515 (Ala.Crim.App.1993), aff'd, 639 So.2d 522 (Ala.1994); and Reynolds, 539 So.2d at 429. Courts have held that a continuance may be denied even when that denial results in the defendant's being unrepresented during trial. See, e.g., Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); Burton, 584 F.2d at 489-91; United States v. Hughes, 191 F.3d 1317, 1323 (10th Cir.1999); Bumgarner v. Lockhart, 920 F.2d 510, 512-13 (8th Cir.1990); United States v. Studley, 783 F.2d 934, 938-39 (9th Cir.1986); United States v. Leavitt, 608 F.2d 1290, 1293 (9th Cir.1979). Where the Sixth Amendment right to counsel is implicated, an assessment of the trial court's ruling on a motion for a continuance depends on the circumstances of the particular case. See Baker, 683 So.2d at 5, citing Burton, 584 F.2d at 491-92.
The argument in Moody's brief focuses on the abuse-of-discretion standard generally applicable to continuance issues; however, because the trial court's denial of a continuance culminated in Moody's proceeding through the trial without an attorney, Moody's claim in this regard also presents the larger question whether the trial court's ruling effectively deprived him of his right to counsel. The Sixth Amendment *554 to the United States Constitution guarantees a right to counsel in criminal proceedings. See also Art. I, § 6, Ala. Const.1901; Rule 6.1(a), Ala. R.Crim. P. At the same time, a defendant in a criminal proceeding has a right under the Sixth Amendment to waive his right to counsel and to conduct his own defense. See Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (recognizing the right to self-representation); Tomlin v. State, 601 So.2d 124, 128 (Ala.1991). "A defendant in a capital case also has that right." Sibley v. State, 775 So.2d 235, 242 (Ala.Crim.App.1996), aff'd, 775 So.2d 246 (Ala.2000). See, e.g., Ford v. State, 515 So.2d 34, 40 (Ala.Crim.App.1986), aff'd, 515 So.2d 48 (Ala.1987).
"In order to conduct his own defense, the defendant must `knowingly' and `intelligently' waive his right to counsel, because in representing himself he is relinquishing many of the benefits associated with the right to counsel. Faretta [v. California], 422 U.S. [806,] at 835, 95 S.Ct. [2525,] at 2541, [(1975)]. The defendant `should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."' Faretta, 422 U.S. at 836, 95 S.Ct. at 2541 (other citations omitted)."
Tomlin, 601 So.2d at 128.
While it is desirable that the trial court engage, as it did in this case, in a colloquy in which it expressly advises the defendant of "the dangers and disadvantages of self-representation," such a colloquy is not mandated. Tomlin, 601 So.2d at 128. The ultimate test is whether it "appear[s] from the record as a whole that a defendant's waiver of counsel and decision to represent himself were knowing and intelligent." Teske v. State, 507 So.2d 569, 571 (Ala.Crim.App.1987); see Tomlin 601 So.2d at 128-29. See also Rule 6.1(b), Ala. R.Crim. P. Under this approach, the focus of the inquiry is on "the particular facts and circumstances involved, `including the background, experience, and conduct of the accused.' Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)." Tomlin, 601 So.2d at 128-29.
In order to address the propriety of the trial court's refusal to grant Moody a continuance to secure the services of Lewis and Matteson, it is necessary first to determine whether Moody effected a valid waiver of counsel before requesting the continuance. For if Moody never validly waived his right to counsel  and if Moody had arrived at trial without having been afforded the full protections of the Sixth Amendment  it would have been error for the trial court to have commenced the proceedings and to have required Moody to proceed through the trial without the aid of a lawyer.
The record reflects that in the proceedings that led up to his trial, Moody clearly, unequivocally, and repeatedly asserted his right to represent himself. Moody first expressed his desire to proceed pro se in a motion filed on July 25, 1994, after he had asserted an unambiguous lack of confidence in the performance of his court-appointed attorneys, Turberville and Jaffe, and had acted in various ways to have them removed as his counsel. After a hearing on the matter, Turberville and Jaffe were allowed to withdraw with no objection from Moody. At hearings held on August 2, 1994, and May 7, 1996, the trial court conducted lengthy colloquies during which it explicitly warned Moody of the perils of going forward without counsel. At those hearings, Moody repeatedly asserted that he wanted to represent himself. At several other hearings conducted between the hearings of August 2, 1994, *555 and May 7, 1996, the trial court made multiple inquiries of Moody to determine whether he was standing by his request to proceed pro se  throughout those proceedings, Moody repeatedly reaffirmed his desire to represent himself.[22] Although Moody alluded at those hearings to having been in contact with attorneys who were interested in representing him, he stated that none of those attorneys was willing to take his case. Several times, the trial court advised Moody that, if he so desired, the court would appoint new counsel to represent him and that it was the court's recommendation that he accept counsel. However, throughout the proceedings that led up to his trial, Moody never requested the appointment of new counsel or indicated that he had somehow obtained counsel on his own.
Even assuming that Moody's original motivation for seeking to proceed pro se was his discontent with the performance of Turberville and Jaffe and that he could conceivably have been satisfied with substituted counsel (a highly doubtful supposition, given his history of dissatisfaction with, and dismissal of, his attorneys in prior legal proceedings), Moody's requests to proceed pro se remained clear and unequivocal throughout the proceedings that led up to his trial.[23] Moody failed to present any evidence, moreover, that the performance of Turberville and Jaffe was inadequate during the more than two-year period they represented him. In fact, the record supports the conclusion that Turberville and Jaffe vigorously and quite competently performed their duties with regard to Moody's defense, including filing all relevant motions and pursuing the investigation of the case.
Nor do we find equivocation amounting to a withdrawal of waiver of counsel in Moody's assertions at some of the pretrial hearings that he was being forced to proceed pro se because (according to Moody) no attorney could provide him with an adequate defense under the payment limitations imposed by Alabama's statutory scheme for compensating appointed counsel. Each time after making such an assertion, Moody, when questioned by the trial court, reaffirmed his desire to represent himself.
From a review of the record, and in light of Moody's background and previous experiences in the criminal justice system, it is also clear that Moody accepted and understood the reasons behind the trial court's explicit warnings regarding self-representation and that Moody knowingly and intelligently waived his right to counsel. Moody was not a novice: he had previously sat through criminal trials of his own, had been convicted of serious felony offenses, and had served time for those offenses. He was surely aware that the capital offenses for which he was standing trial were serious matters that could involve serious penalties, including a sentence of death. The trial court specifically advised him of that possible consequence. Because of his previous experience in legal proceedings, Moody was also aware that *556 trying a case would involve examining witnesses, making objections, and observing rules of procedure and evidence.[24] The trial court here also expressly advised Moody of these matters. We are confident, then, that when Moody asserted his right to self-representation, he knew what lay ahead of him. Accordingly, we find that Moody effected a valid waiver of counsel before he requested the continuance to obtain the services of Lewis and Matteson. His Faretta rights were fully vindicated in the proceedings that led up to his trial.
Having determined that Moody validly waived his right to counsel in the proceedings before his trial, we address the propriety of the trial court's refusal to grant Moody a continuance to obtain the services of Lewis and Matteson, first requested by Moody after the voir dire examination of the prospective jurors had begun. Neither Moody nor any of the attorneys who sought the continuance on his behalf offered the trial court an explanation for Moody's failure to indicate earlier that he no longer wished to proceed pro se and that he wanted to be represented by Lewis and Matteson. Nor is any explanation offered in Moody's brief on appeal to this court.
As is apparent from our discussion above, after Moody first requested to proceed pro se, on July 25, 1994, he repeatedly reasserted his right to self-representation. Moody's request to proceed pro se was granted on August 2, 1994. Thereafter, he steadfastly reaffirmed his desire to proceed pro se, until toward the end of the first day of voir dire examination, on October 7, 1996. Thus, for more than two years leading up to his trial, during which time the issue of Moody's representation was repeatedly revisited, Moody maintained the status of a pro se defendant and indicated again and again that he intended to represent himself. During this time, Moody was aware  having been repeatedly advised by the trial court  that he could withdraw his waiver of counsel at any time and have new counsel appointed to represent him.[25] Moody was also aware  having been expressly admonished by the trial court  that if he withdrew his waiver of counsel and had new counsel appointed, he would not be allowed to delay the trial.[26] Despite this, when making his eleventh-hour reassertion of his right to counsel, Moody indicated to the trial court that his request to have Lewis and Matteson represent him was contingent on the trial court's granting of a 12- to 18-month continuance.
Moody argues that Lewis and Matteson needed the lengthy continuance, in part, to review allegedly exculpatory evidence contained in the so-called "Whitehurst memorandum." However, the record reflects, and the trial court noted when denying the request for a continuance, that the United States Department of Justice had provided Moody with a copy of the memorandum in August 1995 and that the State of Alabama had provided Moody *557 with a copy of the same memorandum, during the discovery process, in September 1995. Thus, for more than 13 months before his trial began  and before he requested that Lewis and Matteson be allowed to represent him and that he be granted a continuance so that they could prepare his defense  Moody had a copy of the memorandum in his possession.[27] Therefore, Moody cannot be heard to argue that the circumstances that allegedly made a lengthy continuance necessary were unforeseeable or that they were based on some last-minute discovery of theretofore unknown evidence. While Lewis and Matteson may not have been aware of the matters contained in the Whitehurst memorandum until shortly before Moody requested that they be allowed to represent him, Moody, by his own dilatory conduct, brought about the conditions that prevented trained counsel from preparing his defense during the many months before his trial. Even where, as in this case, Sixth Amendment issues are implicated, a trial court may properly consider the defendant's role in shortening the effective preparation time of counsel. See Baker, supra, 683 So.2d at 5-6, citing Ringstaff v. State, 480 So.2d 50, 53 n. 1 (Ala.Crim.App.1985). "[N]o matter how fundamental the right to counsel may be, it may not be used as a means of delaying or trifling with the court." United States v. Mitchell, 777 F.2d 248, 258 (5th Cir.1985).
We recognize that Rule 6.1(c), Ala. R.Crim. P., provides that "[a] defendant may withdraw a waiver of the right to counsel at any time." See Ex parte King, 797 So.2d 1191, 1193-94 (Ala.2001). However, Moody's representations to the trial court that he wished to withdraw his waiver of counsel must be considered in the context in which they occurred. Moody expressly conditioned his reassertion of his right to counsel on the trial court's granting a 12- to 18-month continuance to allow his new attorneys time to prepare. It is clear from Moody's statements to the trial court, and from the statements of the attorneys who argued in support of a continuance, that Moody was unwilling to proceed with counsel unless the trial court granted a lengthy continuance. While Moody had a right to withdraw his waiver of counsel, see Rule 6.1(c), he did not have the right to condition that withdrawal on an unreasonable disruption of the proceedings. Although the waiver of the right to counsel must be knowing and voluntary in order to be valid, see Faretta, 422 U.S. at 835, 95 S.Ct. 2525, the Sixth Amendment
"`does not grant the defendant license to play a cat and mouse game with the court, or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel.'"
Hughes, supra, 191 F.3d at 1323, quoting United States v. Allen, 895 F.2d 1577, 1578 (10th Cir.1990). As this court has recognized, the Sixth Amendment right to counsel "`"is a shield" and "should not be used as a sword with the purpose of obstructing the orderly procedure of the courts or to interfere with the fair administration of justice."'" Baker, 683 So.2d at 6, quoting Reynolds, supra, 539 So.2d at 429, quoting in turn Richardson v. State, 476 So.2d 1247, 1248 (Ala.Crim.App.1985).
When the trial court refused to grant Moody's requested continuance, Moody's trial had already been continued several times. Some of that delay was attributable to Moody's own dilatory conduct. Before *558 trial, Moody had clearly waived his right to counsel and had proceeded pro se for more than two years. Moody had been repeatedly advised that, while he had a right to withdraw his waiver of counsel at any time, the proceedings would not be delayed further as a result of his reasserting his right counsel. Moody himself was at fault for shortening the effective preparation time of new counsel. He did not attempt to show why he had failed to reassert his right to counsel at an earlier time. In denying a continuance, the trial court indicated that it was taking notice of Moody's stalling tactics and his history of dissatisfaction with the attorneys who had represented him. Indeed, there was every reason to believe that Moody would ultimately become dissatisfied with the performance of any attorney serving as his counsel, including Lewis and Matteson. In the setting posed, we conclude that the trial court was fully justified in considering Moody's request for further delay to be contrived. The record demonstrates that Moody was primarily attempting to obstruct and manipulate the legal process.
Other courts have found that obstructionist and dilatory conduct like the kind engaged in by Moody may constitute a waiver of Sixth Amendment protections:
"It logically follows that such conduct may operate as a constructive discharge of counsel whether retained or appointed, or a de facto waiver of the right to be represented by such counsel. In either case, a trial court is not bound by constitutional mandate to appoint another attorney, or provide the defendant with an additional opportunity to secure counsel. Instead, courts are accorded wide discretion in deciding whether to grant continuances to enable a defendant to secure new counsel. See Sampley [v. Attorney General of North Carolina], 786 F.2d [610,] at 613 [(4th Cir.1986)] (`[t]he constitutional right is probably best stated as a limit on trial court discretion: that discretion only exceeds its constitutional bounds when it is exercised to deny a continuance on the basis of an "unreasoning and arbitrary `insistence upon expeditiousness in the face of a justifiable request for delay'"') (quoting Ungar[ v. Sarafite], 376 U.S. [575,] at 589, 84 S.Ct. 841 [(1964)].")
McNair v. Commonwealth, 37 Va.App. 687, 697, 561 S.E.2d 26, 31 (2002). See Sampley v. Attorney General of North Carolina, 786 F.2d 610, 613 (4th Cir.1986) ("[A] defendant has no constitutional right to dictate the time, if ever, at which he is willing to be tried by simply showing up without counsel, or with allegedly unsatisfactory counsel, whenever his case is called for trial, ... or by objecting that counsel then retained or assigned is not presently `counsel of his choice.'"); United States v. Proctor, 166 F.3d 396, 402 (1st Cir.1999) ("It also is within the district court's discretion to refuse a defendant's request to withdraw from self-representation after a valid waiver if a defendant seeks counsel in an apparent effort to delay or disrupt proceedings on the eve of trial, or once trial is well underway."); United States v. Taylor, 933 F.2d 307, 311 (5th Cir.1991) ("A defendant is not entitled ... repeatedly to alternate his position on counsel in order to delay his trial or otherwise obstruct the orderly administration of justice."); State v. Carruthers, 35 S.W.3d 516, 547 (Tenn.2000) ("the right to counsel can be implicitly waived or forfeited if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial"), cert. denied, 533 U.S. 953, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); People v. Howell, 615 N.Y.S.2d 728, 729, 207 A.D.2d 412, 413 (1994) ("It is well established that a defendant may not manipulate the right to counsel for purposes of delaying and disrupting the trial."); Morris v. Slappy, 461 U.S. 1, 12-13, *559 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (similar); Ungar v. Sarafite, supra, 376 U.S. at 589-91, 84 S.Ct. 841 (similar); United States v. Merchant, 992 F.2d 1091, 1095 (10th Cir.1993) (similar); Studley, supra, 783 F.2d at 938-39 (similar); Leavitt, supra, 608 F.2d at 1293-94 (similar); United States v. Solina, 733 F.2d 1208, 1211-12 (7th Cir.1984) (similar); State v. Montgomery, 138 N.C.App. 521, 524-25, 530 S.E.2d 66, 69 (2000); Brickert v. State, 673 N.E.2d 493, 496 (Ind.Ct.App.1997) (similar); State v. Green, 238 Neb. 475, 481, 471 N.W.2d 402, 407 (1991) (similar); Burns v. State, 300 Ark. 469, 472, 780 S.W.2d 23, 24 (1989) (similar); Neal v. State, 689 S.W.2d 420, 427 (Tex.Crim.App.1984) (similar). See also Meyer v. Sargent, 854 F.2d 1110, 1113-15 (8th Cir.1988) (defendant's actions in seeking new counsel halfway through trial and then electing to proceed pro se were largely obstructionist and constituted a "major factor" in court's conclusion that defendant's waiver of counsel was valid); Bumgarner v. Lockhart, supra, 920 F.2d at 512-13 (defendant's request on the day of trial for a continuance so that he could retain an attorney after he had previously insisted that he be allowed to proceed pro se constituted a "ruse").
The trial court has a duty to safeguard the legitimate rights of a defendant while avoiding turning the trial into a sport in which the defendant manipulates the proceedings in hopes of injecting reversible error into the case no matter how the trial court rules. Moody's actions presented the trial court with a judgment call to which we give due deference. We find that, under the circumstances, the trial court did not err in refusing to grant Moody a continuance to secure the services of Lewis and Matteson.

III.
Moody contends that the trial court erred in failing to appoint standby counsel to assist him in his defense. (Issue III in Moody's brief.)
When a criminal defendant has elected to waive counsel and conduct his own defense, "a trial court may appoint standby counsel `to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the achievement of his own clearly indicated goals.'" Lucas v. State, 645 So.2d 333, 333 (Ala.Crim.App.1994), quoting McKaskle v. Wiggins, 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). However, the appointment of standby counsel is not constitutionally mandated. See Lucas, 645 So.2d at 333; Ford v. State, 515 So.2d 34, 43 (Ala.Crim.App.1986), aff'd, 515 So.2d 48 (Ala.1987). The decision whether to appoint standby counsel rests within the discretion of the trial court. See Ford, 515 So.2d at 43-44; Lucas, 645 So.2d at 333-34. See also Rule 6.1(b), Ala. R.Crim. P.
As we indicated in Part II of this opinion, although the trial court repeatedly advised Moody that he was entitled to standby counsel, Moody never asserted an unequivocal desire to have standby counsel appointed. In a letter dated August 4, 1994, shortly after the trial court granted his motion to proceed pro se, Moody informed the trial court that he did not want standby counsel. Although Moody later vacillated somewhat on the question of standby counsel during the various hearings where the issue of his representation status was revisited, whenever the trial court advised him at those hearings of the limited role any standby counsel would have, Moody's response was to express dissatisfaction, not to request that standby counsel be appointed. The transcripts of those hearings reflect that Moody intended to assent to the appointment of standby *560 counsel only if such counsel would function as what amounted to his legal-research assistant, and only if such counsel would perform extensive pretrial investigation at his direction. It is clear that Moody wanted to exercise complete control over any counsel's actions, including all tactical and strategic decisions as to how to prepare and present the case. However, Moody was not entitled to the assistance of an attorney who would allow him to run the whole show. While a defendant has a right to be represented by counsel or to represent himself, he is not entitled to a hybridized representation of his own design. See Ford, supra, 515 So.2d at 43-44. See also, e.g., Holland v. State, 615 So.2d 1313, 1320 (Ala.Crim.App.1993); Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991). Finally, at a hearing held on May 7, 1996, Moody expressly informed the trial court that he did not want standby counsel. The record reflects the following exchange at that hearing:
"[THE COURT]: Do you understand that it is the Court's duty to find counsel for you and to appoint that counsel to represent you, if you desire the appointment of counsel?
"[MOODY]: Yes, sir.
"[THE COURT]: Do you understand that you are not entitled under the constitution or under Alabama law to represent yourself in this case and to have counsel assist you, do you understand that?
"[MOODY]: Again, that's something that I will accept your word. I haven't read that but 
"[THE COURT]: Well, I guess what I am saying, Mr. Moody, if I explain to you that that is the law in Alabama, do you understand what I am saying?
"[MOODY]: Yes, sir, I do.
"[THE COURT]: Do you understand that this court may, in its sound discretion, appoint counsel to stand by and advise you, but is not required by law to do so?
"[MOODY]: I would object to that being done.
"[THE COURT]: But you do not wish to have standby counsel?
"[MOODY]: No, sir. Now if that's the same  on one occasion we discussed what constituted standby counsel.
"[THE COURT]: Yes, sir.
"[MOODY]: And the best understanding that I got is that would be precisely what he would do, he would stand by and not do anything. Under those circumstances I think it would simply give the jury the impression that I have been provided with adequate counsel, when in fact I had not been. So, under those circumstances, I would not want a standby counsel appointed."
(Vol. 57, hearing of May 7, 1996, R. 27-29.)
Moody's claim on appeal  that, despite his express refusal of standby counsel, the trial court should nonetheless have appointed standby counsel  illustrates a trial court's dilemma when confronted with a defendant who has expressed the desire to proceed pro se. It would not be too cynical for us to speculate that, had the trial court appointed standby counsel over Moody's objection, Moody would now be raising as a ground for reversal a claim that the trial court failed to honor his right of self-representation. "`Whichever way the trial judge decides, his decision is subject to challenge.'" Washington v. State, 539 So.2d 1089, 1094 (Ala.Crim.App.1988), quoting Pickens v. State, 96 Wis.2d 549, 568, 292 N.W.2d 601, 611 (1980).
Because Moody expressly refused standby counsel, his claim on appeal implicates the invited-error doctrine.

*561 "`"`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'"' Slaton v. State, 680 So.2d 879, 900 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Cr.App.1990). As we have said in applying the invited error doctrine, `"It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice."' Murrell v. State, 377 So.2d 1102, 1105 (Ala.Cr.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). `The invited error rule has been applied equally in capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Cr.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
"`An invited error is waived, unless it rises to the level of plain error.' Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991)."
Burgess v. State, 811 So.2d 557, 596 (Ala.Crim.App.1998), aff'd in part, rev'd in part on other grounds, 811 So.2d 617 (Ala.2000).
In support of his argument that the trial court erred in failing to sua sponte appoint standby counsel, Moody cites this court's decision in Russaw v. State, 572 So.2d 1288 (Ala.Crim.App.1990). In Russaw, the defendant, who was charged with the capital offense of murder committed during a robbery, waived his right to counsel and proceeded to trial pro se. Standby counsel was not appointed to assist the defendant. The defendant refused to participate at his trial, and he was convicted of capital murder and was sentenced to death. This court reversed on appeal, holding that, under the circumstances, there had been a "`total breakdown of the judicial system'" and that "the defendant did not receive a fair trial."[28] 572 So.2d at 1294. Moody argues that, in light of his own refusal to participate in his trial and the trial court's failure to appoint "at least standby counsel," the same "breakdown of the judicial system" that occurred in Russaw took place in his case. (Moody's brief at p. 16.) In so arguing, Moody points to this court's statement in Russaw that "[e]specially in the prosecution of a capital offense, a trial court should also give consideration to the appointment of standby counsel to represent a defendant who elects to waive counsel and then elects to not participate in the trial." 572 So.2d at 1295. However, it is clear from the record here that the trial court fully considered the appointment of standby counsel and that Moody expressly objected to the appointment of any standby counsel. Russaw did not, as Moody appears to suggest, establish a per se rule requiring the appointment of standby counsel for a pro se defendant, even over the defendant's objection, where the defendant refuses to participate in his trial. In fact, imposing such a requirement could, in certain circumstances, seriously risk violation of a defendant's Sixth Amendment rights.
*562 In McKaskle v. Wiggins, supra, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122, the United States Supreme Court recognized that where standby counsel has been appointed over a defendant's objection, excessive participation by standby counsel or the appearance that the defendant is not representing himself may violate the defendant's Sixth Amendment right to self-representation. 465 U.S. at 178, 104 S.Ct. 944. The Supreme Court reasoned that "[t]he defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear pro se exists to affirm the accused's individual dignity and autonomy." Id. Thus, the very explanation Moody ultimately proffered to the trial court for his refusal of standby counsel  that he did not want the jury to be given the impression that he was represented by counsel  closely parallels the Sixth Amendment right recognized by the Supreme Court in McKaskle.
The record reflects Moody's hostility toward the attorneys who had previously been appointed to represent him in this case, as well as his history of questioning the competence of his attorneys in the many prior legal proceedings in which he had been involved. Also evident from the record are Moody's attempts to manipulate his Sixth Amendment rights to subvert the process in this case. The trial court could reasonably have concluded that, under the circumstances, appointment of standby counsel over Moody's objection would have resulted in an infringement on his right of self-representation. See Ford, supra, 515 So.2d at 43 ("Both Faretta [v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] and [McKaskle v.] Wiggins [, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)] recognized that the appointment of counsel for an accused who has elected to represent himself may violate the accused's Sixth Amendment rights."); see also Lucas, supra, 645 So.2d at 333.
Moreover, although Moody moved, after the trial was underway, to have attorneys Lewis and Matteson represent him as his counsel, the trial court was not in a position to appoint those attorneys to assist Moody at trial in a more limited standby capacity. As we noted in Part II of this opinion, Moody's request for representation by Lewis and Matteson was contingent on the trial court's also granting a 12- to 18-month continuance. It appears from the record that, at the time of Moody's trial, Lewis was not even in Alabama. The record also reflects that Matteson, who was present in the courtroom when Moody's trial began, informed the trial court that he could not provide Moody with adequate representation unless he was granted a continuance and stated flatly that he did not wish to appear as Moody's counsel unless a continuance was granted. Under the circumstances, and given Moody's all-or-nothing position concerning the granting of a lengthy continuance for Lewis and Matteson to prepare his defense, there is no reason to believe that Moody would have accepted assistance from Lewis or Matteson had the trial court appointed one or both them as his standby counsel and then ordered that the case proceed without further delay. Again, we have little doubt that had the trial court appointed any standby counsel over Moody's objection, Moody would now be arguing that he was prevented from fully exercising his right of self-representation.
In Russaw, this court also stated:
"`"[T]he trial court has a continuing responsibility to watch over the defendant and insure that his incompetence is not allowed to substitute for the obligation of the state to prove its case. If, during the course of the trial, it becomes *563 apparent that the defendant is simply incapable, because of an inability to communicate or because of a complete lack of understanding, to present a defense that is at least prima facie valid, the trial court should step in and assign counsel. But because the defendant is not to be granted a second chance simply because the first is going badly, counsel should be appointed after trial has begun, or a mistrial ordered, only where it appears the defendant should not have been allowed to proceed pro se in the first place."'"
572 So.2d at 1295-96, quoting Washington, supra, 539 So.2d at 1094, quoting in turn Pickens, supra, 96 Wis.2d at 568, 292 N.W.2d at 611 (emphasis added in Washington). Here, it is clear that Moody's nonparticipation in his trial was not the result of his "inability to communicate" or of his "lack of understanding" of the judicial process. Rather, Moody refused to participate in his trial in protest of the trial court's refusal to further delay the proceedings by granting the last-minute continuance that Moody had requested. Obstructionism and petulance, not ignorance or bafflement, lay behind Moody's actions. The record reflects that Moody possessed a rational as well as factual understanding of the proceedings against him and that he chose not to participate.
We are convinced that on the facts and circumstances of this case, the appointment of standby counsel over Moody's objection would not have remedied the situation; more likely, it would have given Moody one more thing to complain about and would have exacerbated his uncooperativeness. Moody's refusal to participate should be considered against the backdrop of his past actions. As we have already noted, the trial court, in denying Moody's requested continuance, indicated that it was taking notice of Moody's stalling tactics and his history of dissatisfaction with attorneys who had represented him in this and other cases. See Russaw, 572 So.2d at 1295 (where a defendant who is proceeding pro se refuses to participate in the trial, the trial court, before continuing with the trial, should determine that "the defendant is either deliberately, knowingly, and intentionally attempting to obstruct or hinder the judicial process and the prosecution in that particular case, or that the defendant is deliberately, knowingly, and intentionally refusing to participate in the trial").
Finally, this is not a case where Moody "should not have been allowed to proceed pro se in the first place": as discussed in Part II of this opinion, the trial court conducted extensive pretrial proceedings to ensure that Moody's waiver of his right to counsel was knowing and intelligent and that Moody's Faretta rights were fully protected in those proceedings. We reject Moody's contention, then, that the appointment of standby counsel would somehow have salvaged his defense. The trial court did not commit error, plain or otherwise, when it failed to appoint standby counsel to assist Moody. See People v. Howell, 615 N.Y.S.2d 728, 729, 207 A.D.2d 412, 413 (1994) (under the circumstances of the case, "including the defendant's vigorous insistence that he not be aided by standby counsel," the trial court did not err by failing to appoint standby counsel to assist a pro se defendant who refused to participate in his trial).

IV.
Moody contends that § 15-12-21, Ala.Code 1975, as it read at the time of his trial, was unconstitutional as applied to his case. (Issue I in Moody's brief.)
At the time of Moody's trial, § 15-12-21, Ala.Code 1975, provided that state funds for payment of attorney fees and other *564 expenses reasonably incurred by counsel for an indigent defendant, including fees for experts, were to be disbursed only after the conclusion of the defendant's trial. See § 15-12-21(d) and (e) before § 15-12-21 was amended effective June 10, 1999.[29] Moody argues that the statute's disallowance of advance payments to attorneys for experts severely limited his ability to obtain an adequate defense and deprived him of his constitutional rights to due process and equal protection of the law.
Moody's claim in this regard was the subject of various pretrial proceedings that produced several published opinions and unpublished decisions by this court and the Alabama Supreme Court. See, e.g., Ex parte Moody, 684 So.2d 114 (Ala.1996); Ex parte Moody, 658 So.2d 446 (Ala.1995); Ex parte Moody, 681 So.2d 276 (Ala.Crim.App.1996); Alabama v. Moody, (No. CR-93-1031, April 13, 1994) (Ala.Crim.App.1994) 658 So.2d 919 (table). We recount the relevant factual and procedural history. In March 1992, shortly after they were appointed to represent Moody, attorneys L. Dan Turberville and Richard S. Jaffe filed with the trial court a motion for special expenses, seeking additional state funds to pay attorney fees and other expenses, including fees for experts necessary for Moody's defense. Turberville and Jaffe contended specifically that the additional funds were needed to pay for the services of experts who would analyze and testify concerning complex evidentiary matters relating to the characteristics of explosive devices. They claimed such experts were essential to Moody's defense because "the entire case focuses upon the resolution of questions the answers of which are enlightened by expert testimony, and especially when the State will offer expert testimony itself." (Vol.1, C. 139.) Turberville and Jaffe maintained that Moody, as an indigent defendant, lacked the means to hire the necessary experts, but that if Moody "were of sufficient means, there is no question that he would hire the ... experts to help prepare his defense." (Vol.1, C. 138.)
Shortly after Turberville and Jaffe filed the motion for special expenses, the State, through the attorney general's office, agreed to furnish the trial court $35,000 in funds for the court to disburse to Moody's defense team as a supplement to the ordinary attorney fees and expenses payable for the defense of indigents under § 15-12-21(d), Ala.Code 1975.[30] The trial court *565 memorialized that agreement in an order entered on May 15, 1992; the order provided, in pertinent part:
"By stipulation, the parties have agreed to the terms of this order which was jointly submitted by them.
"This capital case is an extraordinary one in terms of the amount of pretrial preparation and trial time that it will require. It is estimated that the trial of this case will involve more than one hundred witnesses, will entail hundreds of evidentiary exhibits, and could require more than a month. In all probability, it will be the longest criminal trial in the history of this State. It is also estimated that pretrial preparation by defense counsel will require months and will include, among other things, the discovery and study of tens of thousands of pages of documents.
"Neither the State of Alabama nor the Alabama Attorney General's Office is under any legal duty to provide funds to compensate the defendant's appointed counsel beyond the statutory amounts prescribed in Code of Alabama 1975, § 15-12-21(d). Nonetheless, due to the nature of the case, the Attorney General has volunteered to provide to the Court for its use in paying attorney fees to the defendant's appointed counsel the sum of $35,000, which shall be used by the Court to supplement the attorneys fees otherwise payable under § 15-12-21(d). The parties have agreed, and the Court finds and orders, that this is a one-time payment, that there will be no further such payments, and that this action in no way obligates either the State or the Attorney General to provide any other funds in this case from any source or fund, except as the State is required to do in any capital case under §§ 15-12-21 through 15-12-23.
"The $35,000 in funds referred to in this order shall be paid out of `Court Assessed Costs Not Provided For  Legal Advice and Legal Services Program' funds. The funds shall be paid into the Court, vouchered to the Clerk of the Jefferson County Circuit Court, who shall deposit the funds into an interest bearing account. Funds shall be paid out of that account only upon order of the Court."
(Vol.1, C. 183-84.)
In the ensuing months, through numerous periodic disbursements ordered by the trial court, the $35,000 was withdrawn from the account and paid to Turberville and Jaffe for various expenses they incurred in preparing Moody's defense. It appears from the record that after all the funds had been withdrawn from the account, Moody's counsel moved to have the trial court approve further state funds to pay attorney fees and to pay expenses for expert assistance and for paralegal services. Moody's counsel specifically alleged that the experts who were needed to prepare Moody's defense would not provide their services without being paid in advance and that, consequently, it was necessary for the trial court to approve interim payments for the experts. Following ex parte proceedings on the matter, the trial court issued orders approving the requested interim payments, and on January 24, 1994, the trial court issued an order directing the state comptroller to pay immediately *566 the funds sought by Moody's counsel. The comptroller, however, refused, contending that § 15-12-21, as it then read, provided that such funds were to be disbursed only after the conclusion of the trial.
Consistent with the comptroller's contention, the State, on March 14, 1994, petitioned this court for a writ of prohibition, requesting that we quash all orders of the trial court that directed the comptroller to immediately pay the funds requested by Moody's counsel. The State argued that the trial court's orders improperly directed the comptroller to engage in actions that contravened the comptroller's prescribed authority under § 15-12-21. On April 13, 1994, by an unpublished order, this court granted the writ of prohibition, stating as follows:
"It is ORDERED that the petition for writ of prohibition ... is hereby granted.
"The respondent circuit judge of Etowah County, specially appointed to the circuit court of Jefferson County, is hereby ordered to set aside his order of January 24, 1994, as well as any prior ex parte orders entered by the respondent, insofar as such orders direct the Comptroller for the State of Alabama to immediately pay to the defense counsel in the cause of State of Alabama v. Walter Leroy Moody, Jefferson County No. CC-92-726, monies designated for the payment of attorney's fees; expenses and fees for experts; compensation for paralegals and other assistants designated by the court; and the expense of providing office space by defense counsel."
(Vol.8, C. 1494.)
After this court overruled Moody's application for rehearing, Moody, through counsel, sought certiorari review in the Alabama Supreme Court, arguing that the failure to provide advance payments to his attorneys and for experts violated his constitutional rights. The Supreme Court initially granted certiorari review to consider Moody's constitutional claims. However, on August 2, 1994, shortly before the Supreme Court granted the petition for certiorari review, the trial court allowed Moody's attorneys, Turberville and Jaffe, to withdraw from further representation of Moody and granted Moody's request to proceed pro se. (See Part II of this opinion.) In an opinion quashing the writ of certiorari, the Supreme Court noted that Turberville and Jaffe, upon withdrawing from the case, were no longer claiming an entitlement to interim payments for attorney fees and other expenses they had incurred in representing Moody; accordingly, the Supreme Court found that the issue whether Moody's counsel was entitled to interim payments was moot.[31] See Ex parte Moody, 658 So.2d 446, 448 (Ala.1995).
*567 As for Moody's claim that the failure to provide advance payment of expenses for experts violated his constitutional rights, the Supreme Court found that argument to be "premature." Id. The Supreme Court stated that Moody would be entitled to expert assistance
"only if he makes a threshold showing, approved in advance by the trial court, that expert assistance is necessary and critical for trial in accordance with Dubose v. State, [662] So.2d [1189] (Ala.1995), and only if he presents evidence, e.g., by affidavit, that the expert will not testify without being partially or completely compensated before he or she testifies or before the conclusion of the trial."
Ex parte Moody, 658 So.2d at 448.
Thereafter, in light of the Supreme Court's statements, the trial court appointed an attorney, similar to a special master under Rule 53, Ala. R. Civ. P., to conduct an investigation concerning payment of Moody's proposed expert witnesses. The trial court ordered the special master to inquire into whether Moody's experts "will work for the defendant, provide reports, assist in preparation of his defense, and/or testify at trial, but receive reimbursement at the conclusion of the case as is required under Alabama law." (Vol.10, C.1971.) In addition, the trial court ordered the special master to locate experts other than those proposed by Moody who would be willing to provide their services for Moody and to not be paid until the conclusion of the trial. The trial court directed the special master to conduct the investigation without participation by the State or Moody and to report its findings to the trial court. The trial court later amended its order to delete the requirement that the special master locate alternative experts who had not been proposed by Moody, reasoning that such a requirement "would have the effect of making the special master a representative of the defendant." (Vol.10, C.1978.)
After conducting the inquiry ordered by the trial court, the special master submitted a report containing findings that 16 of the 24 expert witnesses proposed by Moody had submitted affidavits stating that they would require advance payment to cover expenses for any travel in connection with the case and receipt of interim payment after completion of any work done in preparation for trial. Thereafter, the trial court entered ex parte orders finding that the services of certain experts were necessary to ensure the fairness of Moody's trial.
Moody, proceeding pro se by that time, filed a petition for a writ of mandamus with the Alabama Supreme Court, asking that Court (1) to take whatever action it deemed necessary to prevent his being "forced to trial" before resolution of "the constitutional questions raised by the State's refusal to provide funds necessary for [Moody's] ... defense"; and (2) to take whatever action it deemed necessary "for the proper Alabama court to rule on the constitutional questions raised by the State's refusal to provide funds necessary" for Moody to prepare his defense. Accompanying Moody's petition were additional supporting materials, including the ex parte orders of the trial court finding that the services of certain experts were necessary to ensure the fairness of the trial. The trial court also forwarded to the Alabama Supreme Court the special master's findings concerning interim payment of Moody's proposed experts.
Finding that Moody had complied with the directions set out in Ex parte Moody, supra, 658 So.2d at 448, and based on the additional materials filed with Moody's mandamus petition, the Alabama Supreme Court stated that "[t]he issue whether Moody is entitled to certain experts and, if *568 so, whether those experts are entitled to be paid in advance is no longer premature." Ex parte Moody, 684 So.2d 114, 118 (Ala.1996). Using as a guideline the United States Supreme Court's decision in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Alabama Supreme Court then defined the standard by which a trial court must assess an indigent defendant's request for expert assistance. Reiterating the standard it had set forth in Dubose v. State, 662 So.2d 1189 (Ala.1995),[32] the Alabama Supreme Court held that once a defendant is found to be indigent, in order to be entitled to the assistance of an expert, he" `must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial.'" Ex parte Moody, 684 So.2d at 119, quoting Dubose, 662 So.2d at 1192, citing in turn Moore v. Kemp, 809 F.2d 702 (11th Cir.1987). The Alabama Supreme Court stated that in order to satisfy this standard, "the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense." Ex parte Moody, 684 So.2d at 119. The Supreme Court held that, in order to protect an indigent defendant's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, the trial court should conduct an ex parte hearing on the defendant's request for expert assistance.[33]Ex parte Moody, 684 So.2d at 120.
Addressing the question whether Moody was entitled to the experts of his own choosing, the Supreme Court held:
"As stated earlier, the [United States] Supreme Court in Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985),] held that an indigent defendant is not entitled to a psychiatrist of his choosing, but is entitled to have a competent psychiatrist who will assist in evaluation, preparation, and presentation of the defense. In Whisenhant v. State, 482 So.2d 1225 (Ala.Crim.App.1982), aff'd in part and remanded with directions, 482 So.2d 1241 (Ala.1983), cert. denied, 496 U.S. 943 [110 S.Ct. 3230, 110 L.Ed.2d 676] (1990), the Court of Criminal Appeals held that there exists no constitutional right to the appointment of a private psychiatrist of a defendant's own choosing, at public expense.
"Accordingly, we hold that an indigent defendant is not entitled to the expert of his particular choice, but is entitled to a competent expert in the field of expertise that has been found necessary to the defense. That is, once the court has determined that there is a reasonable probability that expert assistance *569 would aid in the indigent defendant's defense and that the denial of such expert assistance would result in a fundamentally unfair trial, the defendant is not entitled to name the particular expert he wants.
"An indigent defendant has no right to shop for an expert to contradict experts for the state. Certainly, the trial court can consider the indigent defendant's request for a particular expert. However, the trial court may choose any competent expert in that particular field of expertise who would aid the defendant in evaluation, preparation, and presentation of the defense. Similarly, an indigent defendant is not entitled to legal counsel of his choice, when counsel is to be paid by public funds, but rather is entitled to competent legal representation.
"The factors the trial court should consider in choosing an expert, once it is determined that expert assistance is necessary, are: (1) the number of experts available to choose from; (2) what the indigent defendant expects the expert's testimony to prove at trial or how the defendant expects the expert's testimony would aid in the defense; (3) the indigent defendant's choice of expert; (4) other competent experts available; and (5) the anticipated costs of such an expert. This list of factors is not meant to be exhaustive; the trial court may consider any other relevant information regarding experts in the particular field of expertise."
684 So.2d at 121-22 (emphasis added).
Turning to Moody's claim that the failure to provide advance payment of expenses for his experts violated his constitutional rights, the Supreme Court held:
"Section 15-12-21(e), Ala.Code 1975, provides that within a reasonable time after the conclusion of the trial or ruling on a motion for a new trial or after an acquittal or other judgment disposing of the case, a bill for services rendered may be submitted by the clerk of the court to the comptroller for payment. We see no reason to contravene the mandate of the legislature and allow for experts aiding indigent defendants to be paid before trial. As stated earlier, an indigent defendant is not entitled to the expert of his choosing, when the expert is to be paid at public expense. Accordingly, any expert who requires payment before trial could be replaced by another person with expertise in the particular field."
684 So.2d at 122 (emphasis added).[34]
Disposing of the matter, the Supreme Court issued a writ of mandamus directing the trial court to conduct another ex parte hearing on Moody's request for experts and to apply the guidelines set out in the *570 Supreme Court's opinion. 684 So.2d at 122.
Thereafter, in the months leading up to Moody's trial date, the trial court conducted three ex parte hearings on Moody's request for experts. At the outset of the first of those hearings, held May 7, 1996, Moody informed the trial court that, before advising the trial court of the experts he was requesting, he wanted to contact each of 21 experts who had been approved earlier under the ex parte orders of the trial court that had been quashed when the Court of Criminal Appeals issued its writ of prohibition, and to ask those experts whether they required prepayment for their services or would be willing to wait for payment until the conclusion of the trial. The trial court agreed to give Moody time to contact those experts. A second ex parte hearing on Moody's request for experts was held nearly 10 weeks later, on July 18, 1996; the record reflects the following exchange between the trial court and Moody at that hearing:
"THE COURT: Mr. Moody, you and I had a discussion on May 7 at the conclusion of an earlier hearing where it was just you and I present at that time. Do you recall that?
"[MOODY]: Yes, I do.
"THE COURT: The last time you and I talked. And you had indicated to me on that time, and I'm reading from the transcript here, that you would want to write each of the experts that had been approved by the Court as far as the Supreme Court ruling and asking again their position in regard to payment and then at that point in time, `I would be able to discuss with the Court in a more informed way where I stood so far as all these people are concerned.'
"So I guess really what I need to hear from you at this point, sir, is what your feelings are and what your situation is in regard to experts.
"[MOODY]: Well, the situation is that I am provided with one sheet of paper, one envelope and one stamp a week, no pen. I'm provided with a telephone that allows me to call five preselected numbers. So I haven't had any means to contact anybody.
"In addition to that, the 65 boxes of legal material and all the legal material that [the paralegal who was assisting Moody in his defense] has has been unavailable to me.
"THE COURT: Do you know where that is? Have you been told where that material is?
"[MOODY]: I think she has it at different locations 
"THE COURT: [The paralegal] does?
"[MOODY]:  is my understanding. Yes, sir.
"THE COURT: In going through the record of your previous trial in federal court, or trials, I have made a list here and have determined, of course this would have to be double checked, but these following experts, and I want to go over them with you one by one, were paid at the federal trial.
"[MOODY]: May I interrupt you, Your Honor, before you get into that?
"THE COURT: Yes.
"[MOODY]: I have repeatedly tried to indicate to the Court that I'm not being provided with material necessary to represent myself pro se, and as a result of that, I will advise the Court at this point in time that I am unable to proceed.
"THE COURT: What do you mean by that, sir? Are you requesting the Court appoint you an attorney?
"[MOODY]: No, sir, I'm not. I'm saying that the Court has failed in its responsibility to provide me with what I *571 must have in order to defend myself pro se and as a result of that failure, I cannot proceed.
"THE COURT: Well, sir, you realize the trial date has been set?
"[MOODY]: Sure, I realize that.
"THE COURT: You know that?
"[MOODY]: I realize that.
"THE COURT: Well, let me just, and I appreciate you, you know, stating that, but let me just go ahead and continue with what I was saying. I have a list here of the experts.
"[MOODY]: Well, Your Honor, I don't want to make any comment regarding this proceeding until I'm provided with whatever I need in order to make a legitimate defense.
"THE COURT: Okay. Well, I'm going to read for the record a list of experts that were paid at the federal trial and who, it's my understanding, this would have to be confirmed, are willing to be reimbursed under Alabama law.
"What that means for the record is that they would come and testify and at the conclusion of the case their reasonable expenses, if approved by the Court, would be paid by the comptroller.
"Number one is George J. Bonebrake, B-o-n-e-b-r-a-k-e, fingerprint consultant. Would you answer whether that gentleman was used as an expert in your federal case or not?
"[MOODY]: No, sir, I won't. I've made all the statements I intend to make regarding this case until I'm provided with what I need to defend the case.
"THE COURT: So let me make sure I understand. You're saying to me here that I have a list of eight experts, whose names I'm going to read in a moment anyway, but it's your position  I guess I need to get straight on exactly what your position is.
"You are not requesting that this Court appoint you an attorney at this time?
"[MOODY]: Well, Your Honor, this Court had the opportunity to appoint an attorney and did so, not you but the Court on two different occasions. They were inadequate. I brought that to the Court's attention. The Court failed to correct the problems.
"I then sought to subpoena about 12 witnesses to show the Court the extent of the inadequacy and I was not allowed to examine those witnesses. So I have no reason whatsoever to believe that the Court has a sincere interest in providing me with adequate representation.
"THE COURT: Okay. So therefore, you are not requesting, based on the reason that you've given here, you are not asking this Court to appoint you an attorney?
"[MOODY]: No, sir, I am not. I'm asking the Court to provide me with what is necessary for me to defend myself."
(Ex parte hearing of July 18, 1996, supp. C. 4-8.)
Later at that same ex parte hearing, Moody informed the trial court that he was aware of four of his proposed experts who had reviewed the "Whitehurst memorandum" (see Part II of this opinion), and who had indicated that they were willing to provide their services to Moody while waiting until the trial's conclusion to be reimbursed. At the time of the hearing, however, Moody could provide the trial court with the name of only one of those experts.
A third and final ex parte hearing on Moody's request for experts was held on August 13, 1996. At that hearing, Moody indicated that four of his proposed experts had agreed to provide their services to him without prepayment. Moody, through the paralegal who was voluntarily assisting *572 Moody in his defense, provided the trial court with the names of those experts. Moody then advised the trial court that the paralegal had furnished copies of the Whitehurst memorandum to 17 other potential expert witnesses who had previously indicated that they would require prepayment for their services; Moody informed the court that the paralegal had asked those experts whether, after reading the memorandum, they would consider providing their services to Moody and waiting for reimbursement, presumably on Moody's conjecture that the experts would "make concessions" regarding prepayment because the memorandum would convince them that Moody was being "framed."[35] The trial court and Moody then engaged in the following exchange:
"THE COURT: Sir, do you understand that under the current criminal rules of procedure in the state of Alabama that the State, the attorney general's office, has a right to the names of these experts prior to trial?
"[MOODY]: Prior to trial, yes, I do.
"THE COURT: You understand that?
"[MOODY]: Right.
"THE COURT: Do you have any objections to the Court giving these four names to the attorney general's office today?
"[MOODY]: Yes, I would.
"THE COURT: All right. What grounds is that?
"[MOODY]: Because I think it would be premature. These people haven't even  in other words, so far we haven't even set up a system whereby the evidence can be presented to these people. This is one of the things I wanted to talk to you, Your Honor. As soon as you will name somebody that can get the evidence to those people I can present information to the Court that will be that specific where I can say that particular evidence needs to go to a certain expert for testing.
"THE COURT: What evidence you're talking about, is this evidence what was used against you in the earlier trial?
"[MOODY]: Yes, sir.
"THE COURT: But you have seen it, or you are at least familiar with what it's called?
"[MOODY]: Yes, sir. Well, I'm not sure what it's called. The way I would like to do it is  in other words, the State has all these pictures attached as exhibits. I would have no objection with presenting a motion to the Court and saying these pictures need to go to a certain expert with his name being held ex parte until after the results are presented to me. And then at that point in time, after all this is done, after the experts have done their thing, then I think that would be the appropriate time to present their names to the State."
(Ex parte hearing of August 13, 1996, supp. C. 6-7.)
On August 27, 1996, the trial court entered an order with regard to Moody's request for experts; in that order, the trial court found, in pertinent part:
"The undersigned [William H. Rhea III, Circuit Judge] has, repeatedly, advised [Moody] that he should allow the Court to appoint counsel to represent him. [Moody] has refused court-appointed counsel and is continuing to represent himself pro se. [Moody] has advised the Court he has been in contact with certain experts and is contacting other experts. *573 If [Moody] can meet his burden of proving to the Court that he needs these experts, the Court will allow the same. [Moody] is advised that this case will not be continued for his failure to obtain said experts.
"The undersigned has had three (3) ex parte hearings with [Moody] since the 4/19/96 decision of the Alabama Supreme Court was rendered in this case [in Ex parte Moody, 684 So.2d at 122]. At the hearing on 8/13/96, [Moody] gave the Court the names of several experts he may wish to use and stated that he was in the process of contacting others. [Moody] stated to the court he could not state, with any certainty, he was going to call any of these experts. The undersigned ORDERS [Moody] to immediately notify the Court if and when he decides he wants to call these experts as witnesses so the Court can rule if said witness can be used by [Moody] and, also, so the State of Alabama can be notified of the names, etc., of these experts."
(Vol.1, C. 41-42.)
It appears from the record that Moody never notified the trial court whether he wanted to use the experts at trial. Nor did he ever designate any specific item of evidence that he wanted made available to a specific expert. On October 3, 1996, the week before Moody's trial began, the trial court entered an order that contained the following findings:
"In conformance with the April 1996 order of the Alabama Supreme Court the undersigned [William H. Rhea III, Circuit Judge] had several ex parte hearings with [Moody] concerning the question of [Moody's] experts to be used at trial, if any.
"The undersigned has received no specific information from [Moody] concerning the experts [Moody] expects to use at trial. The undersigned went over the names of the experts which [Moody] had proposed to use in his previous Federal trial in Minnesota. In addition, the undersigned discussed with [Moody] the experts who were previously approved by this Court and also other alleged experts of whom [Moody] apprised the Court.
"[Moody] has failed to give the Court any specific names of experts he definitely plans to call at trial. [Moody] requested [that] this Court provide certain parts of the evidence for inspection and testing by [Moody's] experts but when the Court questioned [Moody] as to the specific type of evidence needed and to whom said evidence should be sent, [Moody] failed and refused to supply this information to the Court.
"[Moody] had indicated to the Court, since he was representing himself, that he was having difficulty giving the Court the necessary information about his proposed experts. The Court went into great detail with [Moody], pointing out, again, to [Moody] the dangers of representing himself, the fact that the State of Alabama was attempting to have the death penalty imposed in this case, and that [Moody] needs an attorney to represent him. [Moody], once again, refused to allow the Court to appoint counsel for him."
(Vol.1, C. 46.)
As we have noted, the Alabama Supreme Court, in reviewing pretrial proceedings involving Moody, upheld the facial validity of § 15-12-21, Ala.Code 1975, as the statute then read. The Supreme Court specifically found that the statute's provision disallowing pretrial payment of experts passed constitutional muster because an indigent defendant does not have a constitutional right to an expert of his or her own choosing, and therefore, any expert *574 requested by the defendant who requires advance payment can properly be replaced by an expert who does not.[36] See Ex parte Moody, 684 So.2d at 121-22. We find that Moody has failed to demonstrate that § 15-12-21, as it read at the time of his trial, was unconstitutional as applied to his case.[37] After examining the record, including the transcripts of the ex parte hearings conducted by the trial court, we are convinced that Moody, although he was afforded every opportunity to establish his need for expert assistance, failed to demonstrate specifically the purpose and nature of the expert assistance he sought. We agree with the trial court that Moody was insufficiently forthcoming with information concerning the manner in which he expected his experts to aid in his defense or what he expected his experts' testimony to prove at trial. As the trial court found, Moody failed to inform the trial court of the specific evidence he wanted made available for inspection and testing by his experts, and failed to provide the trial court with the names of the experts to whom he wanted specific items of evidence made available. The record reflects that Moody never furnished the trial court (or the State) with the name of any expert he planned to call at trial. In ensuring that Moody received a fair trial, the trial court discussed with Moody the possibility of appointing those experts who had assisted Moody in his 1991 federal trial  which involved virtually the same evidence.[38] However, rather than cooperating with the trial court in its efforts to see that he was afforded the necessary expert assistance, Moody refused to discuss the possibility of the appointment of the experts who had assisted him in his federal trial and instead persisted in raising complaints about the disabilities caused by his pro se status.[39] This was, unfortunately, consistent with Moody's other obstructionist and dilatory actions in this case. Moody has not shown that he is entitled to any relief on his claim that the disallowance of advance payments for experts deprived him of his constitutional rights.

V.
Moody contends that the trial court erred in allowing the prosecutor to divulge allegedly prejudicial information regarding Moody during the voir dire examination of prospective jurors. (Issue IV in Moody's brief.) Moody specifically points to remarks made by the prosecutor during the individual voir dire of prospective juror K.C., in which the prosecutor stated that everything Moody had been telling K.C. during voir dire was "a complete and unadulterated lie" and informed K.C. that Moody had been convicted of perjury and of paying people to lie. (Vol.60, R. 469.)
*575 Throughout the voir dire process, Moody had made statements to prospective jurors indicating that he was being forced to proceed pro se and that the trial court was preventing him from obtaining the services of an attorney.[40] After Moody made similar statements during the individual voir dire of K.C., the prosecutor asked K.C. how she would feel if she knew that Moody had been sitting in jail for four years and that the judge "had asked him on 10 occasions if he wanted the Court to appoint him a lawyer, and he had consistently said, `I don't want a lawyer, I'm going to represent myself.'" (Vol.60, R. 465.) The prosecutor, presumably referring to attorney David L. Lewis (see Part II of this opinion), then asked K.C. if she would hold it against the State if she was told that Moody got a lawyer "at the last minute from New York that's not qualified to practice in Alabama and can't even come down here on time to be here for the case." (Vol.60, R. 465.) After the prosecutor made these remarks, Moody asked K.C. how she would feel if she knew that the trial court had previously appointed two attorneys to represent him and that "one of these attorneys turned out to be an FBI informant, and the other one turned out to be a bigamist, twice over." (Vol.60, R. 467.) Moody then told K.C. that the two attorneys had been "funneled $55,000 [sic] to sabotage my defense" and that he "had to fire them because they would not work."[41] (Vol.60, R. 467.) In response to these statements by Moody, the prosecutor informed K.C. that everything Moody had just said was a lie and that Moody had been convicted of perjury and of paying people to lie.
Moody contends that the prosecutor's remarks to K.C. were prejudicial and that the trial court, by allowing the remarks, failed to properly exercise its discretion to control the voir dire process. Moody did not raise this claim in the trial court; thus, our review of this issue is for plain error only. Rule 45A, Ala. R.App. P.; Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
We find no possibility that Moody was harmed by the prosecutor's remarks. The record reflects that at the conclusion of the voir dire process, just before the striking process began, the trial court sua sponte excused K.C. from the jury. Thus, K.C. was not among the 18 jurors who were empaneled as the trial jury. The prosecutor made the remarks to which Moody now objects during the individual voir dire of K.C., when no other prospective jurors were present (see note 40). There is no evidence indicating, and Moody does not even allege, that K.C. imparted the information to anyone who ultimately sat on the jury. Before the voir dire process began, the trial court instructed the entire venire panel not to discuss among themselves or with anyone else the matters that might be brought out during individual voir dire. It is presumed that K.C. followed these instructions. See, e.g., Reeves v. State, 807 So.2d 18, 32 (Ala.Crim.App.2000), cert. denied, *576 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001).
The reasons set forth above are sufficient to dispose of this issue. However, we would also point out that during its case-in-chief in the guilt phase of Moody's trial, the State introduced extensive evidence concerning the events that resulted in Moody's being convicted in 1990 on federal charges of suborning perjury and obstructing justice, for paying witnesses to lie on his behalf in another federal-court proceeding. For reasons explained in Part VII.B of this opinion, that evidence was properly allowed. Had K.C. actually sat on the trial jury, she would have heard legal evidence that was essentially the same as the information imparted in the prosecutor's remarks during voir dire. Under the circumstances, we find no error, plain or otherwise, as to this claim.

VI.
Moody contends that the trial court erred by informing prospective jurors that Moody had caused his court-appointed attorneys, Turberville and Jaffe, to withdraw from representing him, that he had thereafter rejected the court's repeated offers to appoint him new counsel, and that he had on numerous previous occasions sought to change attorneys on the eve of trials. (Issue V in Moody's brief.) Moody contends that the trial court committed additional error when it then questioned the prospective jurors as to whether they believed Moody's trial should be continued. (Issue VI in Moody's brief.)
The record reflects that on the morning of October 11, 1996, after the individual voir dire of prospective jurors was completed, the trial court made the following remarks to the entire panel of veniremembers:
"[Moody] has informed many of you that he does not have an attorney. And it is apparent that he does not have an attorney. I think all of you have been back and have seen me individually in this case either once or twice. And Mr. Moody has led some of you to believe that he does not have an attorney and that if this case is put off, the attorney will be available for him to represent him.
"So I believe it is incumbent on me to clarify the situation in regard to Mr. Moody's attorney, or lack of attorney, or not having an attorney for all of you.
"Mr. Moody was indicted in this case in 1992[sic]. And two well-respected attorneys here in Jefferson County were appointed to represent him. And Mr. Moody arranged for these attorneys to be required to withdraw from this case through no fault of the attorneys.
"The defendant has represented  Mr. Moody has represented to this Court that he preferred to represent himself rather than have this Court appoint him another attorney. And this was after these attorneys had withdrawn.
"And I want you to know that I, as the judge, have on numerous occasions, repeatedly over the years, offered to appoint an attorney for Mr. Moody, that Mr. Moody has refused as late as this week the Court's appointment of an attorney.
"Mr. Moody has indicated to most of you, or maybe all of you, that he has an attorney available and that he wants this attorney present during this trial and that this attorney could only be available if this case was continued or put off.
"And I want you to know that [Moody] has done this numerous times *577 in the past, of trying to change attorneys on the eve of trials."
(Vol.61, R. 671-73.)[42]
After making these remarks to the venire, the trial court questioned the prospective jurors individually, asking each whether, considering the statements by Moody and the trial court regarding Moody's representation status, he or she believed the case should be delayed or continued. In addition, the trial court directed each prospective juror to disregard any statements that had been made concerning the status of Moody's representation or his past dealings with his attorneys. The trial court also instructed each prospective juror that, if selected to sit on the trial jury, he or she should decide the case based on the evidence presented at trial and on the applicable law set out by the trial court.
Moody argues that he was unfairly prejudiced by the trial court's remarks apprising prospective jurors of his problems with his counsel in this case and of his practice of changing attorneys on the eve of trial. Moody did not raise this claim by timely objection in the trial court; therefore, our review is for plain error only. Rule 45A, Ala. R.App. P.
As noted earlier, throughout the voir dire process, Moody made statements to prospective jurors indicating that he was being forced to proceed pro se and that the trial court was preventing him from obtaining the services of an attorney.[43] Thus, Moody himself injected the issue of his representation status into the voir dire process, in an obvious attempt to influence  and mislead  those who might sit on his jury so that they would believe he was being deprived of his constitutional rights and was being persecuted by the trial court and the State. Because Moody's statements to prospective jurors were misleading, it was proper for the trial court to clarify Moody's representation status for the prospective jurors. Moody cannot be heard to complain about the trial court's remarks concerning an issue that Moody himself improperly injected into the proceedings. See Walker v. State, 631 So.2d 294, 301 (Ala.Crim.App.1993). Under the invited-error doctrine, a party cannot allege an error in the proceedings that was a natural consequence of his own actions in the trial court. See Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996). Thus, to the extent that the trial court's remarks addressed Moody's statements regarding his representation status in the present case, we find no error.
The trial court went beyond the scope of Moody's statements, however, when it also informed the venire that "numerous times in the past," Moody had "tr[ied] to change attorneys on the eve of trials." While we do not condone this statement by the trial court, which may have resulted from the court's frustration with Moody's disruptive tactics,[44] we find *578 that any resulting error was harmless. See Rule 45, Ala. R.App. P. During its case-in-chief in the guilt phase of Moody's trial, the State introduced evidence regarding Moody's extensive litigation history. That evidence indicated, among other things, that Moody had been involved in numerous prior legal proceedings in which he had fired or dismissed his attorneys. For reasons explained in Part IX of this opinion, such evidence was properly allowed before the jury. Thus, the jury heard legal evidence with much the same import as the trial court's remarks regarding Moody's practice of firing attorneys on the eve of trial. Furthermore, after making the remarks about which Moody now complains, the trial court instructed prospective jurors to disregard any statements that had been made regarding Moody's past dealings with his attorneys and to decide the case based on the evidence and on the law set out by the trial court. We are convinced that the trial court's actions were sufficient to impress upon the prospective jurors that they were to disregard matters relating to Moody's past dealings with his attorneys and thus were sufficient to eradicate any potential prejudicial effects. There is a presumption against error when the trial court promptly instructs jurors to disregard such extraneous matters. See Wilson v. State, 777 So.2d 856, 919 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001).
We further disagree with Moody's contention that the trial court, by asking each prospective juror whether he or she believed that Moody's trial should be continued, was effectively transferring to the veniremembers the court's own discretion regarding the propriety of granting a continuance. This specific claim was not raised in the trial court; therefore, the issue is subject to review under the plain-error standard. Rule 45A, Ala. R.App. P. It is clear from the record that the trial court asked the prospective jurors this question to determine the existence of any bias that may have resulted from the earlier statements by Moody and the trial court regarding Moody's representation status and to ascertain what steps, if any, the court would need to take to eradicate the potential bias. After each prospective juror was asked his or her opinion concerning a continuance, the trial court, regardless of the prospective juror's answer,[45] gave instructions that issues relating to Moody's representation status should be disregarded and that the case should be decided on the law and the evidence. As we noted above, this was a sufficient safeguard against potential prejudice.
The manner in which voir dire examination is conducted is within the broad discretion of the trial court. See Smith v. State, 797 So.2d 503, 519 (Ala.Crim.App.2000), cert. denied, 797 So.2d 549 (Ala.), cert. denied, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001); Wilson, supra, 777 So.2d at 917. After reviewing the voir dire proceedings, we find that no reversible error occurred as a result of the trial court's statements to prospective jurors concerning Moody's representation status and his past dealings with his attorneys, or as a result of the trial court's questioning the prospective jurors concerning a continuance.

*579 VII.
Moody contends that the trial court erred in allowing the State to introduce evidence of collateral crimes. (Issues VII and VIII in Moody's brief.)
In Burgess v. State, 811 So.2d 557 (Ala.Crim.App.1998), aff'd in part, rev'd in part on other grounds, 811 So.2d 617 (Ala.2000), this court discussed the admissibility of evidence concerning other crimes or wrongs committed by a defendant, explaining as follows:
"`On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....
"`....
"`The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted.'
"C. Gamble, McElroy's Alabama Evidence, § 69.01(1) at 300-01 (5th ed.1996) (footnotes omitted).
"`Evidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for "other purposes" than to prove the accused's guilt.' Williamson v. State, 629 So.2d 777, 780 (Ala.Cr.App.1993). In Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this court discussed the exceptions to the general exclusionary rule:
"`Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
"`"(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes."
"`Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App.1986). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985); Brewer v. State, [440 So.2d 1155 (Ala.Cr.App.), cert. denied, 440 So.2d 1155 (1983)]; Miller v. State, 405 So.2d 41 (Ala.Cr.App.1981); Thompson v. State, 374 So.2d 377 (Ala.Cr.App.1978), aff'd, 374 So.2d 388 (Ala.1979); McMurtrey v. State, 37 Ala.App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy's §§ 69.01(1)-(11); Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence *580 of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"`"All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"`Underhill, Criminal Evidence § 154 (3d ed.1923).'
"521 So.2d at 1025-26. `"The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge."' Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App.1996), cert. denied, 698 So.2d 238 (Ala.1997), quoting Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987).
"In Bradley v. State, 577 So.2d 541 (Ala.Cr.App.1990), this court stated:
"`We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)]. "It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character." C. Gamble, McElroy's Alabama Evidence § [69.01(1)] (3d ed.1977) (quoting Mr. Justice McElroy, 2nd ed.)
"`"In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it."
"`Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if "it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury," Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App.1985), or put another way, "unless its probative value is `substantially outweighed *581 by its undue prejudice,'" United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)).
"`....
"`Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was "material and logically relevant" to an issue or issues in the case.'
"577 So.2d at 547-48."
811 So.2d at 578-79.
These concepts have been incorporated into the Alabama Rules of Evidence, which became effective on January 1, 1996. Specifically, Rule 404(b), Ala. R. Evid., provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

A.
In challenging the admission of evidence of collateral crimes, Moody first asserts that the trial court should not have allowed the State to introduce evidence concerning the pipe bombs mailed in December 1989 to Robert Robinson in Savannah, to the courthouse for the Eleventh Circuit Court of Appeals in Atlanta, and to the Jacksonville office of the NAACP. (Issue VII in Moody's brief.)
During its case-in-chief in the guilt phase of Moody's trial, the State presented evidence indicating that on December 18, 1989, two days after Judge Vance was killed by the pipe bomb mailed to his residence, civil rights attorney Robert Robinson was killed by a pipe bomb that had been mailed to his Savannah law office. The State also presented evidence indicating that on December 18, 1989, another pipe bomb was received at the courthouse for the Eleventh Circuit Court of Appeals in Atlanta. That device was discovered and disarmed before it could detonate. The following day, December 19, 1989, a pipe bomb was received at the Jacksonville office of the NAACP. Like the bomb that had been sent to the federal courthouse in Atlanta, that bomb was also discovered and disarmed before it could injure anyone. The State presented evidence, much of it through experts, demonstrating that there were numerous similarities in the construction, design, and packaging of those three pipe bombs, and showing that the three pipe bombs were also very similar to the pipe bomb that killed Judge Vance.
Moody argues on appeal that the evidence surrounding those other pipe bombs should not have been admitted because, he says, it was collateral-crimes evidence that was irrelevant to any material issue in the case and was also unduly prejudicial.
The record reflects that Moody, when he was still being represented by his court-appointed attorneys, filed pretrial motions in limine seeking to prevent introduction *582 of evidence regarding the other pipe bombs. Those pretrial motions were denied; however, Moody did not object when the evidence in question was offered at trial. The general rule is that an adverse ruling on a motion in limine does not preserve the issue for appellate review unless an objection is made at the time the evidence is introduced. Grimsley v. State, 678 So.2d 1197, 1208 (Ala.Crim.App.1996). Accordingly, we review Moody's claims under the plain-error standard. Rule 45A, Ala. R.App. P.; see Burgess, supra, 811 So.2d at 577-78.
We find that the evidence regarding the three other pipe bombs mailed in December 1989 was admissible pursuant to the identity exception and the plan-design-or-scheme exception to the general exclusionary rule of character. See Rule 404(b), Ala. R. Evid. Regarding the identity exception, Professor Gamble states:
"All evidence tending to prove a person's guilt of the now-charged crime may be said to identify him as the guilty person. However, the identity exception to the general exclusionary rule of character is much more specific in that it contemplates the situation where the now-charged crime was committed in a novel and peculiar manner and the prosecution is allowed to show that the accused has committed other similar crimes or acts, in the same novel and peculiar manner, in order to show the accused to be the perpetrator of the now-charged crime. The method of carrying out the charged crime and the collateral acts must be novel or peculiar and, because of this requirement, some refer to this as the `signature crime' or `modus operandi' exception. Additionally, a greater degree of similarity must be found when applying the identity exception than is required for the admission of collateral acts to show intent or knowledge.
"The assertion of identity, as a means of securing the admission of collateral acts evidence, becomes viable only when the identity of the person who committed the now-charged crime is material or of consequence in the case. Merely pleading not-guilty does not render identity material or of consequence. Even if identity is not material at the outset of the case, however, it may be made material by conduct of the defense such as cross-examining the identifying witness in such a way as to indicate mistake, by positions taken or in argument of counsel."
Charles W. Gamble, McElroy's Alabama Evidence § 69.01(8) (5th ed.1996)(footnotes omitted). Regarding the plan-design-or-scheme exception, Professor Gamble states:
"Evidence of the accused's commission of another crime or act is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime or act were committed in keeping with or pursuant to a single plan, design, pattern, scheme or system. This rule is applicable whether such plan, design, scheme or system is narrow and specific in scope or is measurably broad and general in scope."
McElroy's Alabama Evidence § 69.01(6) (footnotes omitted).
In Howell v. State, 627 So.2d 1134 (Ala.Crim.App.1993), this court noted the following about the identity exception and the plan-design-or-scheme exception:
"Almost invariably, the identity and common plan, design, or scheme exceptions are discussed together in cases. In fact, the Alabama Supreme Court has stated that the common plan, design, or scheme exception to the general exclusionary rule is `essentially co-extensive *583 with the identity exception.' Ex parte Darby, 516 So.2d 786, 789 (Ala.1987). See also 2 Wigmore on Evidence (Chadbourn rev.1979), § 304.
"`"...."'
"The threshold requirement for the admissibility of collateral acts under these exceptions is that there must be something novel or peculiar about the collateral acts that tends to identify the defendant as the perpetrator of the present crime. Nicks v. State, [521 So.2d 1018 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.1988).]
"`Under the identity exception to the general rule prohibiting the admission of ... collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are "signature crimes" having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person.'
"Bighames v. State, 440 So.2d 1231, 1233 (Ala.Cr.App.1983).
"In Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983), this court stated:
"`One of the common threads running through all of the treatise-writers' explanations of the signature exception is that a strict test of similarity between the charged and non-charged offenses should be applied. McCormick observes the following:
"`"[T]he courts are stricter in applying their standards of relevancy when the ultimate purpose of the state is to prove identity, or the doing by the accused of the criminal act charged than they are when the evidence is offered on the ultimate issue of knowledge, intent or other state of mind."
"`McCormick on Evidence, § 190 at 452 (E. Cleary 2d ed.1972). Wigmore explains the theory as follows:
"`" § 304. Theory of evidencing design or system. When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's design or plan to do it.... This in turn may be evidenced by conduct of sundry sorts ... as well as by direct assertions of the design.... But where the conduct offered consists merely in the doing of other similar acts, it is obvious that something more is required than that mere similarity, which suffices for evidencing intent.... The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a preexisting design, system, plan, or scheme, directed [towards] to the doing of the act. In the former case (of intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of the act charged as a part of its consummation. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present case, the result is to show (by probability) the doing of the act designed.
"`"The added element, then, must be, not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.

*584 "`"....
"`"It will be seen that the difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity. This is another reason why the precedents are so difficult to reconcile; for the courts have not always perceived that there are in truth these two distinct purposes and therefore two distinct tests for such evidence.
"`"Nevertheless the distinction is a real one. It is to be seen in concrete illustrations, even though in abstract definition it is not easy to formulate. The clue to the difference is best gained by remembering that in the one class of cases the act charged is assumed as done, and the mind asks only for something that will negative innocent intent; and the mere prior occurrence of an act similar in its gross features  i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer  may suffice for that purpose. But where the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves so much higher a grade of similarity as to constitute a substantially new and distinct test."
"`2 Wigmore on Evidence § 304 at 249-50, 250-51 (Chadbourn rev.1979) (emphasis in [Wigmore]).'
"Id. at 1161-62."
627 So.2d at 1140-41.
The test of relevancy sanctioned by the Alabama appellate courts has been described as a "liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case." McElroy's Alabama Evidence § 21.01(1) (footnote omitted). Rule 401, Ala. R. Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In Henderson v. State, 598 So.2d 1045 (Ala.Crim.App.1992), we stated:
"`"The test of probative value or relevancy of a fact is whether it has any tendency to throw light upon the matter in issue even though such light may be weak and fall short of its intended demonstration." Tate v. State, 346 So.2d 515, 520 (Ala.Crim.App.1977). "It is not necessary that each item of testimony, taken alone, be conclusively shown to prove the guilt of the defendant; but the question is whether each fact, in connection with all others, may be properly considered in forming a chain of circumstantial evidence tending to prove the guilt of the accused." Russell v. State, 38 So. 291, 296 (Ala.1905).'"
598 So.2d at 1047-48, quoting Barrow v. State, 494 So.2d 834, 835 (Ala.Crim.App.1986).
In this case, the evidence concerning the other pipe bombings in December 1989 was material and logically relevant to prove the identity of the person who constructed and mailed the pipe bomb that killed Judge Vance. The State's case was highly circumstantial, and the identity of Judge Vance's assailant was the central issue at trial. The evidence surrounding the three other pipe bombs mailed in December *585 1989 revealed a distinctive modus operandi tending to show that those bombs and the bomb that killed Judge Vance were the work of the same person.
We note that "[i]f the accused's commission of another crime is otherwise competent and admissible under one of the exceptions to the general exclusionary rule, the state may prove the accused's guilt of the other crime by the same kind of evidence  both circumstantial and direct  that would be admissible if the accused were being tried for the other crime." McElroy's Alabama Evidence 69.02(5) (footnote omitted). See, e.g., Briggs v. State, 549 So.2d 155, 159 (Ala.Crim.App.1988); Eslava v. State, 473 So.2d 1143, 1146 (Ala.Crim.App.1985). The State presented extensive testimony demonstrating numerous similarities in the three other December 1989 pipe bombs and further demonstrating that those pipe bombs were also very similar to the pipe bomb that killed Judge Vance.[46] Based on the similarities, forensic explosives experts concluded that all four bombs had been made by the same person. The evidence concerning the bombs, moreover, was linked by ample other evidence to Moody. In addition to presenting evidence regarding all four December 1989 pipe-bomb incidents, the State presented evidence surrounding a pipe bomb that exploded in Moody's residence in 1972 and that formed the basis of Moody's conviction in 1972 on federal charges of possessing a pipe bomb. (See Parts VII.B and VII.C of this opinion.) The State's experts testified that there were numerous similarities between the 1972 pipe bomb and all four December 1989 pipe bombs, including the bomb that killed Judge Vance.[47] The bombs were so similar and distinctive in their construction and design, in fact, that an expert testified that they shared the "signature" of the same maker. In addition to being linked to all four December 1989 pipe bombs by the numerous similarities with 1972 pipe bomb, Moody was also connected to the four December 1989 pipe bombs by, among other things, the testimony of his former wife, Susan McBride Samford, who testified concerning her procurement, at Moody's direction, of many of the components investigators later found in the exploded and unexploded December 1989 pipe bombs. Clearly, the evidence surrounding the three other December 1989 pipe bombs was so similar to the evidence surrounding the pipe bomb that killed Judge Vance as to create the logical inference that if Moody made and sent those other bombs, he made and sent the bomb that killed Judge Vance.
Furthermore, the evidence regarding the other pipe bombs was admissible as part of a common plan, design, or scheme with the pipe-bomb killing of Judge Vance. In addition to being linked to the pipe bomb that killed Judge Vance by the abundant forensic similarities among all of the pipe bombs, Moody was connected to all of the December 1989 bomb incidents by, among other things, evidence that revealed Moody had "declared war" on the judicial system. The evidence relating to the other December *586 1989 pipe bombs was not "merely similar" to the evidence surrounding the pipe bomb that killed Judge Vance, but rather was so similar as to indicate that Moody had a general plan to commit a series of bombings  using similar devices and means  directed at judges, lawyers, and other persons he believed were representative of and associated with the court system. The evidence surrounding the other December 1989 pipe bombs and the evidence surrounding the pipe bomb that killed Judge Vance contained "`"such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations."'" Howell, supra, 627 So.2d at 1141 (emphasis omitted).
Moody argues that even if evidence of the other pipe-bombing incidents was material and relevant, certain details surrounding those incidents should not have been admitted. He complains particularly about the admission of the details of the death of Robert Robinson, who was killed by the pipe bomb that exploded in his Savannah law office. Moody contends that the jury was inflamed by "highly prejudicial" photographs depicting Robinson's grievous injuries and by testimony about Robinson's suffering before he died as a result of his injuries. However, it is well settled that "if the accused's commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime." Nelson v. State, 511 So.2d 225, 234 (Ala.Crim.App.1986), aff'd, 511 So.2d 248 (Ala.1987). See Hooper v. State, 585 So.2d 142, 150 (Ala.Crim.App.1991); McElroy's Alabama Evidence § 69.02(8).
Moreover, during its case-in-chief in the guilt phase of Moody's trial, the State also introduced a number of photographs depicting Judge Vance's injuries as a result of the bomb blast that killed him. Although the photographs depicting Robinson's injuries (like those depicting Judge Vance's injuries) may have been disturbing, they were relevant to illustrate that the location and severity of the injuries caused by the pipe bomb sent to Robinson corresponded to the location and severity of the injuries caused by the pipe bomb that killed Judge Vance.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986)(videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. *587 Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989). The admission of the photographs in this case was not error, plain or otherwise.
Moody also argues that the probative value of the evidence regarding the three other pipe bombs mailed in December 1989 was substantially outweighed by its prejudicial effect. Under Rule 403, Ala. R. Evid., relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "The power to make this determination is vested in the trial court. We will not disturb such a determination unless it is clearly an abuse of discretion." Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997) (citations omitted). See Powell v. State, 796 So.2d 404, 419 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.), cert. denied 534 U.S. 904, 122 S.Ct. 236, 151 L.Ed.2d 170 (2001); Miles v. State, 715 So.2d 913, 919-20 (Ala.Crim.App.1997); and McElroy's Alabama Evidence § 69.02(1)(c).
In this case, the evidence as to the other pipe bombs was crucial to a central issue at trial and was an essential part of the web of circumstantial evidence that pointed to Moody's guilt in the killing of Judge Vance. We note that the trial court instructed the jury that the evidence as to the other pipe bombs was admitted for the limited purposes of showing identity and a common plan, design, or scheme, that the evidence should be considered for no other purpose, and that the evidence was not admitted to show Moody's bad character or his propensity to commit the type of crime for which he was being tried. See Rule 105(a), Ala. R. Evid. (when evidence that has been admitted is admissible for one or more limited purposes but is not admissible for another purpose, the trial court, upon request, shall instruct the jury to consider the evidence only for its permissible purposes). In light of the broad discretion conferred on the trial court in this context, we conclude that the trial court acted well within its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. In conclusion, there was no error, plain or otherwise, in the admission of the evidence pursuant to the identity exception and the plan-design-or-scheme exception to the general exclusionary rule. Rule 404(b), Ala. R. Evid.

B.
Moody also asserts that the trial court should not have allowed the State to introduce evidence regarding his efforts, during the 1980s, to overturn his 1972 conviction on federal charges of possessing a pipe bomb; those efforts had led to his conviction in 1990 on federal charges of suborning perjury and obstructing justice. (Issue VIII in Moody's brief.)
During its case-in-chief in the guilt phase of Moody's trial, the State presented evidence revealing that a pipe bomb had exploded in Moody's residence in May 1972 and had seriously injured his then wife. Moody was indicted on federal charges of manufacturing and possessing a pipe bomb. During his 1972 federal trial on those charges, Moody testified that a man named Gene Wallace had placed the bomb in his residence with the intent of harming Moody. The jury found Moody guilty of possessing the pipe bomb, and Moody served three years in federal prison. The State presented evidence indicating that after his release from prison, Moody became obsessed with overturning his conviction. Moody had attended law school some years earlier, but never graduated. In the mid 1980s, he inquired into *588 resuming those studies. He learned, however, that the felony conviction would disqualify him from practicing law in Georgia. Believing that his 1972 conviction was unjust and that it also stood in the way of his becoming a lawyer, Moody devised a scheme to get the conviction overturned. The State presented evidence showing that in 1985, Moody bribed Julie Linn-West and her mother, Jo Ann Ekstrom, to give perjured testimony substantiating Moody's claim that Gene Wallace had placed the pipe bomb in Moody's residence in 1972. Moody paid Linn-West and Ekstrom to learn a scripted story, fabricated by Moody, shifting the blame to Wallace. Moody then filed a petition for a writ of error coram nobis in the federal district court in Macon, Georgia, asking the court to vacate his 1972 conviction based on newly discovered evidence. Following a hearing, in March 1988, at which Linn-West and Ekstrom perjured themselves by reciting the scripted story, the district court denied Moody's coram nobis petition. Moody appealed that ruling to the United States Court of Appeals for the Eleventh Circuit, which affirmed the denial of his petition in June 1989. Moody was later indicted on federal charges that he had suborned perjury and obstructed justice by procuring the false testimony of Linn-West and Ekstrom. In December 1990, after a trial at which Linn-West and Ekstrom testified against him, Moody was convicted on those charges. In the present case, much of the State's evidence regarding Moody's efforts to overturn his 1972 conviction by procuring Linn-West's and Ekstrom's false testimony was presented through testimony by Linn-West and by Susan McBride Samford, who was Moody's girlfriend at the time he was attempting to overturn the conviction.
Moody argues on appeal that the evidence regarding his efforts to overturn his 1972 conviction should not have been admitted because, he says, it was irrelevant to any material issue in the case and because, he says, it "served no purpose other than to show [his] propensity to lie and to perhaps manipulate the criminal justice system." (Moody's brief at p. 24.) The trial court denied Moody's pretrial motions in limine seeking to prevent the introduction of this evidence. However, Moody did not object when the evidence was offered at trial. Therefore, Moody's claim is reviewed under the plain-error standard. Rule 45A, Ala. R.App. P.
We find that the evidence regarding Moody's efforts to overturn his 1972 conviction was admissible pursuant to the "motive" exception to the general exclusionary rule. See Rule 404(b), Ala. R. Evid. The State's theory at trial was that Moody was obsessed with overturning the 1972 conviction, because he had convinced himself that the conviction was unjust and because he believed it stood in the way of his becoming a lawyer. The State presented evidence tending to show that Moody was determined to have the conviction overturned through whatever means it took. One of the steps Moody took toward overturning the conviction was to procure false testimony from Julie Linn-West and Jo Ann Ekstrom. That scheme proved unsuccessful in federal court. The State's evidence showed that the federal court's ultimate rejection of Moody's attempt to overturn his conviction precipitated Moody's war on the judicial system, which culminated in the murder of Judge Vance.
Regarding the motive exception to the general exclusionary rule, Professor Gamble states:
"Evidence of the accused's commission of another crime or act is admissible if it tends to show a motive to commit the now-charged crime. Motive has been described as that state of mind *589 which works to `supply the reason that nudges the will and prods the mind to indulge the criminal intent.'"
McElroy's Alabama Evidence § 69.01(7) (footnotes omitted).
This court has stated:
"`"If a crime is clearly shown to have been committed by the accused, as in the case of one intentionally and without cause striking a deadly blow with an ax, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry."
"`Fuller v. State, 269 Ala. 312, 113 So.2d 153, 175 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960) (quoting Harden v. State, 211 Ala. 656, 101 So. 442, 444 (1924)). "It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense." Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988) (quoting earlier cases, emphasis in Bowden).'"
Burgess, supra, 811 So.2d at 581, quoting Bradley v. State, 577 So.2d 541, 549 (Ala.Crim.App.1990).
The evidence of Moody's unsuccessful efforts to overturn his 1972 conviction tended to show that Moody's motive for killing Judge Vance was to "get even" with the judicial system. We find that the danger of unfair prejudice resulting from the admission of this evidence did not substantially outweigh the probative value of the evidence. See Rule 403, Ala. R. Evid. As we have noted, the State's case was highly circumstantial, and the question whether Moody was Judge Vance's assailant was a central issue. Under the circumstances, the question of Moody's motive became "a leading inquiry." Burgess, 811 So.2d at 581, quoting Bradley, 577 So.2d at 549. Moreover, as it did with regard to the other collateral-crimes evidence, the trial court instructed the jury to consider the evidence only for its permissible purpose, i.e., as tending to show motive. We conclude that the trial court acted well within its discretion in admitting the evidence pursuant to the motive exception to the general exclusionary rule. Rule 404(b), Ala. R. Evid. There was no error, plain or otherwise, here.

C.
Moody also asserts that the trial court erred by admitting into evidence the entire transcript of his 1972 trial, which resulted in his conviction on federal charges of possessing a pipe bomb. (Issue VIII in Moody's brief, at pp. 24-25.) Moody did not object when the transcript of the 1972 trial was offered into evidence during the State's guilt-phase case-in-chief; therefore, we review this claim under the plain-error standard. Rule 45A, Ala. R.App. P.
Moody argues that he was prejudiced by the admission of the 1972 trial transcript, but he cites no specific instance indicating how he was unduly prejudiced by any inadmissible matter contained in the transcript. Neither here nor anywhere else in his brief does Moody appear to argue that it was error to admit evidence of the mere fact of his 1972 conviction; nor does he specifically challenge the introduction of evidence surrounding the 1972 pipe bomb.[48] The facts surrounding  and the fact of  Moody's 1972 conviction were introduced through the testimony of several *590 witnesses who testified during the State's case-in-chief in the guilt phase of Moody's trial. Some of that evidence was offered, and was clearly admissible, as tending to show Moody's motive for committing the now-charged offense; and some of that evidence was offered, and was clearly admissible, as tending to prove the identity of the person who constructed and mailed the pipe bomb that killed Judge Vance. Considerable testimony relating to Moody's efforts to overturn his 1972 conviction was also properly introduced during the State's guilt-phase case-in-chief, as evidence of Moody's motive for the pipe-bomb killing of Judge Vance (see Part VII.B of this opinion). In light of the fact that abundant other evidence relating to Moody's 1972 trial was properly admitted, and absent a showing by Moody regarding any undue prejudice he suffered from the jury's consideration of inadmissible matters contained in the 1972 trial transcript, we conclude that no plain error occurred as a result of the admission of that transcript.

VIII.
Moody contends that the trial court erred in allowing the State to introduce evidence concerning his undergraduate and law school records. (Issue IX in Moody's brief, at p. 26.) Moody did not raise this claim in the trial court; therefore, our review of this issue is for plain error only. Rule 45A, Ala. R.App. P.; Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
During its case-in-chief in the guilt phase of Moody's trial, the State introduced the records from Moody's attendance as an undergraduate at Mercer University at its campuses in Macon and Atlanta, Georgia, and from his later attendance at John Marshall Law School in Atlanta. Moody's records from Mercer reflected that he enrolled as a freshman in 1956 and pursued a bachelor of science degree in chemistry, although he did not complete the degree. Moody enrolled again at Mercer in the 1970s, when he took additional courses. While at Mercer, the records showed, Moody took science courses including chemistry, biochemistry, and physics; the physics courses covered such subjects as electricity and magnetism. Moody's records from John Marshall Law School reflected that he took classes there on a part-time basis from the winter of 1966 through the spring of 1968 and that, during that time, he completed approximately half of the course work required for a law degree.
The State also introduced evidence indicating that in May 1986, Moody had contacted the law school and requested a copy of his transcript. Keith Edward Sealing, the chairman of the law school's admissions committee, testified that it was the school's policy not to admit persons with felony convictions on their record, because they would be ineligible to practice law in Georgia. Sealing testified that the law school's admissions committee would counsel an applicant with a felony on his record that it was advisable to obtain a judicial pardon or to have the felony expunged.
On appeal, Moody argues that the evidence concerning his undergraduate and law school records should not have been admitted because, he says, it was irrelevant to any issue in the case. However, we agree with the State's contention that Moody's undergraduate records were relevant as tending to show that Moody had knowledge of the sort of scientific subject matter that was useful in making an explosive device like the pipe bomb that killed Judge Vance. We further agree with the State that Moody's records from John *591 Marshall Law School were relevant as tending to show the basis for Moody's obsession with overturning his 1972 federal conviction. The State presented evidence indicating that Moody intended to return to law school and complete his law degree, with the goal of becoming a lawyer, but that when Moody, sometime in 1985, inquired into resuming those studies, he learned that his felony conviction would disqualify him from practicing law in Georgia. It was the State's theory at trial that Moody's unsuccessful attempt to overturn that conviction precipitated Moody's seeking revenge against the judicial system, which ultimately resulted in the pipe-bomb killing of Judge Vance.
Even if we were to assume that the evidence concerning Moody's undergraduate and law school records was irrelevant, which we do not believe to be the case, we would find that any resulting error in their admission was harmless. See Rule 45, Ala. R.App. P. Certainly, the admission of such evidence did not rise to the level of plain error. See Rule 45A, Ala. R.App. P.

IX.
Moody contends that the trial court erred in allowing the State to introduce evidence concerning his litigation history. (Issue IX in Moody's brief, at p. 26.) Because Moody did not raise this claim in the trial court, we review this issue under the plain-error standard. Rule 45A, Ala. R.App. P.
During its guilt-phase case-in-chief, the State presented testimony from Agent Tracey North of the FBI, who had reviewed records relating to Moody's history of litigation from 1972 through 1990. Agent North testified that, during that period, Moody had been a party in at least 22 trial-level cases, some of which were civil and some of which were criminal. Agent North stated that this number did not reflect all of the cases in which Moody had actually been involved during that time, because the records from many cases where Moody had been a party had been destroyed and were no longer available for her review. She stated that, during the relevant period, Moody had also been involved in a number of other cases in administrative settings that were not courts of record.[49] With regard to the 22 trial-level cases, Agent North testified that Moody had appealed to a higher court in 14 of those cases. At some point at either the trial level or the appellate level in those cases, Moody had represented himself 17 times and had been represented by a total of 26 different attorneys. In the course of such proceedings, Agent North said, Moody had fired or dismissed at least 13 of those attorneys. Agent North stated that Moody had filed at least 74 briefs or motions in legal proceedings in which he indicated that he was acting as his own attorney. Agent North stated that in one proceeding, Moody had fired his attorneys and had then sat at counsel's table and refused to participate in his trial.
According to Agent North, Moody had appealed the decisions in 10 cases to the United States Court of Appeals for the Eleventh Circuit, where that court then *592 ruled against Moody in 6 of the cases. Moody had voluntarily dismissed one of his appeals to the Eleventh Circuit. Agent North stated that Judge Lewis Morgan, whose name was placed on the return-address label of the pipe-bomb package sent to Judge Vance, had sat on two of Moody's appeals to the Eleventh Circuit that were decided adversely to Moody.[50] Agent North stated that Judge Vance had sat on one case Moody had appealed to the Eleventh Circuit; that appeal had been dismissed for lack of jurisdiction. Agent North also testified regarding the coram nobis proceeding that Moody had initiated in 1986 in the federal district court in Macon, Georgia, in an effort to overturn his 1972 federal conviction for possessing a pipe bomb. The district court had denied Moody relief in March 1988, and in June 1989, the Eleventh Circuit had ruled against Moody on appeal.
Moody argues that Agent North's testimony concerning his litigation history was irrelevant and that it was introduced "for no purpose other than to show some aspect of his character." (Moody's brief at p. 26.) However, we find that the evidence of Moody's litigation history was relevant to establish Moody's extensive contact with the judicial system, particularly the Eleventh Circuit Court of Appeals, and was also relevant as tending to show Moody's excessive sense of grievance against the legal system. Such evidence suggested that Moody was vigorously involved in legal disputes with persons who were representative of the legal system  including judges and his own attorneys  and that, again and again, he was dissatisfied with those persons. Moreover, the evidence  particularly the evidence of Moody's pro se activities in many of the proceedings  suggested that Moody was so involved in legal proceedings that he continued to have aspirations of becoming a lawyer himself, a fact that, as we have stated, was relevant to Moody's motive for committing the instant offense.
As we have noted, the State presented evidence indicating that Moody was obsessed with overturning his 1972 federal conviction because he had convinced himself that the conviction was unjust and because he believed it stood in the way of his becoming a lawyer. As we stated in Part VII.B of this opinion, evidence regarding Moody's efforts to overturn the 1972 conviction was admissible pursuant to the motive exception to the general exclusionary rule, Rule 404(b), Ala. R. Evid. As part of those efforts, Moody initiated the coram nobis proceeding in the federal district court in Macon in 1986 and later pursued an appeal to the United States Court of Appeals for the Eleventh Circuit. The violent aspect of Moody's war against the judicial system began shortly after the Court of Appeals upheld the district court's ruling denying Moody relief on his coram nobis petition. The evidence revealing that Judge Vance sat on a case that Moody lost in the Eleventh Circuit and that Judge Morgan sat on two cases, including the coram nobis proceeding, that Moody lost in the Eleventh Circuit also connected Moody to the pipe bomb that was sent to Judge Vance.
The evidence concerning Moody's litigation history supported the State's theory that Moody's motive in sending the pipe bomb was to seek revenge on a justice system he perceived as incompetent and corrupt, and that had robbed him of the *593 opportunity to practice law. We find that the trial court acted well within its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. There was no error, plain or otherwise, in the admission of the evidence.

X.
Moody contends that the trial court erred in allowing the State to introduce evidence concerning his racial animus toward African-Americans. (Issue IX in Moody's brief, at pp. 26-27.) Because Moody did not raise this claim in the trial court, we review this issue under the plain-error standard. Rule 45A, Ala. R.App. P.
During the State's guilt-phase case-in-chief, Karlene Shiver, who had dated Moody in the early 1980s, testified concerning a number of racist remarks she said Moody had made while they were dating. Shiver testified that Moody had stated that African-Americans "should all be put on a boat and sent back to Africa." (Vol.72, R. 402.) She stated that Moody had once "joked" to her that the name of the Chattahoochee River had been changed to the "Chunk Another Nigger River" because the bodies of several African-American children from the Atlanta area had been found in the river. The Atlanta child murders were a prominent story in the news around the time she and Moody were dating. (Vol.72, R. 398.) According to Shiver, Moody had also stated that the "NAACP ... along with the Jews were the downfall of our country." (Vol.72, R. 398.) Shiver testified that Moody particularly disliked African-Americans who were in positions of authority and that Moody had made negative remarks about several prominent African-Americans, including Martin Luther King, Jr., whom she said Moody had called "a card-toting communist," and Maynard Jackson, Atlanta's mayor at the time Shiver and Moody were dating. (Vol.72, R. 399-400.) Shiver stated that Moody had defended George Wallace's attempts to prevent African-Americans from attending the University of Alabama and that, in that context, Moody had called Wallace "one of his heroes." (Vol.72, R. 700.) Shiver stated that Moody had also spoken favorably about Lester Maddox, the former segregationist governor of Georgia. She testified that Moody had also made favorable remarks about the John Birch Society because he believed the organization promoted "the advancement of the white society." (Vol.72, R. 399.)
On appeal, Moody argues that Shiver's testimony concerning Moody's statements allegedly expressing racial animus toward African-Americans was irrelevant and unduly prejudicial. We disagree.
The State presented evidence indicating that in the days that followed the pipe-bomb killings of Judge Vance and Robert Robinson in December 1989, every judge on the Eleventh Circuit Court of Appeals received typed letters in which the sender took credit for the bombings and threatened the recipients with assassination in the name of an organization known as "Americans for a Competent Federal Judicial System." The State also presented evidence indicating that, at around the same time, similar typed death-threat letters were received at the Atlanta and Jacksonville offices of the NAACP. Brenda Wood, an African-American news anchorwoman at WAGA television station in Atlanta, received a separate typed death-threat letter. That letter (quoted verbatim) stated:
"TO: BRENDA WOOD
"FROM: AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM

*594 "ON DECEMBER 19, 1989, OFFICERS OF AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM FROM ALABAMA, FLORIDA AND GEORGIA MET IN SECRET SESSION IN MONTGOMERY, ALABAMA TO ADOPT NEW ORDERS.
"THE FOLLOWING ORDER IS DIRECTED TO YOU.
"1. YOU SHALL CONTACT MARTELLE LAYFIELD JR. AT 3301 CATHRYN DR. COLUMBUS, GEORGIA 31906 AND PROVIDE HIM WITH THE FOLLOWING INFORMATION.
"ROBERT S. VANCE, JUDGE 010187
"ROBERT ROBINSON, ATTORNEY 010187
"THE ABOVE INFORMATION SHALL NOT BE MADE PUBLIC.
"2. UPON RECEIPT OF THIS ORDER, YOU SHALL PRERECORD A REPORT IN WHICH YOU READ ALL OF THE INFORMATION IN SECTION THREE BELOW. A COPY OF YOUR REPORT SHALL BE PROVIDED TO ALL MAJOR NEWS SERVICES.
"ON DECEMBER 25, 1989, YOU AND ALL MAJOR NEWS SERVICES SHALL BROADCAST THE COMPLETE REPORT ON THE EVENING NEWS.
"FAILURE TO COMPLY, FOR ANY REASON, SHALL RESULT IN YOUR ASSASSINATION.
"3. THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT HAS BEEN QUICK TO STRESS THE IMPORTANCE OF CIVIL RIGHTS FOR BLACKS BUT SLOW TO STRESS THE IMPORTANCE OF BLACKS TO DEMONSTRATE CIVIL RESPONSIBILITY.
"THIS FAILURE CREATED A CLIMATE THAT HAS SPAWNED AN ALARMING NUMBER OF SAVAGE ACTS OF VIOLENCE BY BLACK MEN AGAINST WHITE WOMEN.
"JULIE LOVE, FOR EXAMPLE, A YOUNG INNOCENT WHITE LADY WAS ROBBED, KIDNAPPED, GANG RAPED, SODOMIZED, MURDERED AND DISMEMBERED BY A GROUP OF BLACK MALES. HER REMAINS WERE CONCEALED FOR AN EXTREMELY LONG PERIOD OF TIME, LEAVING HER LOVE [D] ONES IN EXCRUCIATING ANGUISH.
"JULIE LOVE WAS AN INNOCENT PERSON, AN INNOCENT PERSON WHO ALSO HAD CIVIL RIGHTS. SHE IS ONLY ONE OF THOUSANDS OF INNOCENT WHITE WOMEN WHO HAVE BEEN RAPED AND MURDERED BY INHUMAN BLACK BARBARIANS.
"PROTECTING THE INNOCENT WARRANTS A HIGHER COURT PRIORITY THAN GRANTING THE BLACKS' DEMANDS FOR WHITE TEACHERS FOR THEIR CHILDREN.
"THE MESSAGE AMERICANS FOR A COMPETENT FEDERAL JUDICIAL [SYSTEM] HAS FOR THE JUDGES IS SIMPLE, IF YOU WANT TO LIVE, YOU SHALL MAKE PROTECTING THE CIVIL RIGHTS OF THE INNOCENT YOUR HIGHEST OBLIGATION AND YOU SHALL FULFILL THAT OBLIGATION.
"THE MESSAGE AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM HAS FOR ATTORNEYS AND FOR THEIR BLACK LEADERSHIP IS ALSO SIMPLE, IF YOU WANT TO LIVE, YOU SHALL TAKE THAT ACTION REQUIRED *595 TO PREVENT BLACK MEN FROM RAPING WHITE WOMEN.
"AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM ASSASSINATED JUDGE ROBERT S. VANCE AND ATTORNEY ROBERT ROBINSON IN REPRISAL FOR THE ATROCITIES INFLICTED UPON JULIE LOVE.
"TWO MORE PROMINENT MEMBERS OF THE NAACP SHALL BE ASSASSINATED, USING MORE SOPHISTICATED MEANS, AS PART OF THE SAME REPRISAL.
"ANYTIME A BLACK MALE RAPES A WHITE WOMAN IN ALABAMA, FLORIDA OR GEORGIA IN THE FUTURE, AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM SHALL ASSASSINATE ONE FEDERAL JUDGE, ONE ATTORNEY AND ONE OFFICER OF THE NAACP.
"4. THE CODE NUMBER 010187 AUTHENTICATES THE ACTIVITIES OF AMERICANS FOR A COMPETENT FEDERAL JUDICIAL SYSTEM AND SHALL NOT BE MADE PUBLIC."
(Vol.31, C. 6039-40.)[51]
In his opening and closing statements to the jury at Moody's trial, the prosecutor argued that Moody viewed himself as a victim of the judicial system and that Moody believed African-Americans in particular received preferential treatment from that system. It was the State's theory at trial that Moody's "war" against the judicial system, which led to the pipe-bomb killing of Judge Vance, was triggered by his inability to convince the courts, specifically those in the Eleventh Circuit, that his 1972 conviction was unjust. It was also the State's theory that Moody sent the death-threat letters from the "Americans for a Competent Federal Judicial System" as a means of throwing law enforcement authorities off his trail and to make it look as if a racist hate-group had committed the bombings. Although the bombings were not, strictly speaking, racially motivated, the sentiments expressed in the death-threat letters, particularly the letter received by Wood, betrayed the racial animus of their sender and suggested that the person responsible for killing Judge Vance viewed his other victims  like Robert Robinson, an African-American civil rights attorney  and his other targets  like the NAACP offices in Atlanta and in Jacksonville, Florida  as disposable objects in his war against the judicial system. Karlene Shiver's testimony concerning Moody's racial animus toward African-Americans was thus relevant as tending to identify Moody as the person who murdered Judge Vance.
We find that the trial court acted well within its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of Shiver's testimony. There was no error, plain or otherwise, in the admission of the evidence.

XI.
Moody contends that "the conduct of the trial as a whole" resulted in his being denied his rights to a fair trial, due process, and equal protection. (Issue X in Moody's brief, at p. 28.) In this regard, he claims that the State "steamrolled" him by introducing "incredible amounts of inadmissible testimony" and that "[t]he trial judge breached his duty to control the proceeding and to protect Moody." *596 (Moody's brief at p. 28.) According to Moody, "[i]t can truly be said that this case is an example of [a] total breakdown of the judicial system." (Moody's brief at p. 28.) This claim is raised for the first time on appeal; therefore, we review this issue under the plain-error standard. Rule 45A, Ala. R.App. P.
Moody refused to participate in his trial once it was underway, and he made no objections other than to reiterate his demands that he be represented by attorneys Lewis and Matteson; therefore, all of the evidence offered by the State was admitted without objection, and the prosecutor's opening and closing arguments at both the guilt phase and the penalty phase of the trial were not interrupted by any defense objections. However, after carefully reviewing the record in this case, we are satisfied  Moody's claim notwithstanding  that the State did not use Moody's knowing and willful nonparticipation to "steamroll" Moody by introducing "incredible amounts of inadmissible testimony" or by making improper arguments to the jury. The State tried its case cleanly. Moreover, the record reflects that the trial court demonstrated admirable forbearance throughout the proceedings. The trial court treated Moody with respect, patiently listened to Moody's arguments and requests, was extremely solicitous of Moody despite his obstructionist tactics, and acted responsibly to vindicate Moody's rights as well as could be expected under the circumstances.
"Fairly tried criminal cases cannot be retried whenever a convicted defendant concludes, with the benefit of hindsight, that he should have employed a different strategy." United States v. Moody, 763 F.Supp. 589, 607 (M.D.Ga.1991), aff'd, 977 F.2d 1420 (1992). Moody received a fair trial in which no plain error occurred.

XII.
The trial court's sentencing order reflects that the court found the existence of two aggravating circumstances: that Moody had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975; and that Moody knowingly created a great risk of death to many persons, see § 13A-5-49(3). The trial court did not find the existence of any statutory mitigating circumstances, see § 13A-5-51, Ala.Code 1975. As required by § 13A-5-52, Ala.Code 1975, the trial court considered all aspects of Moody's character or record and any of the circumstances of the offense that might be a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstances, and found the following to constitute nonstatutory mitigation: that Moody had served in the military for three years and had been honorably discharged; that Moody "has some mild mental problems" (Vol.1, C. 60); and that Moody had not been a disciplinary problem while he was incarcerated in the Jefferson County jail pending his trial.[52]
"`The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict.'" Freeman v. State, 776 So.2d 160, 200 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000), quoting Wesley v. State, 575 So.2d 108, 121 (Ala.Crim.App.1989), rev'd on other grounds, 575 So.2d 127 (1990). We find that the *597 trial court's findings concerning the nonexistence of any statutory mitigating circumstances were amply supported by the record. We find no error, much less plain error, in this regard.

XIII.
Moody contends that his sentence of death violates the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[53]
In Ring, the United States Supreme Court overruled Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to the extent that it allowed the judge, not the jury, to find an aggravating circumstance that supported a death sentence and decided that its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applied to Arizona's death-penalty scheme. See Ring, 536 U.S. at 589, 122 S.Ct. at 2432 ("Capital defendants, no less than non-capital defendants... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). Apprendi had announced the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added); see also Ring, 536 U.S. at 600, 122 S.Ct. at 2439.
Under Alabama law, at least one aggravating circumstance under § 13A-5-49, Ala.Code 1975, must exist in order for a defendant convicted of a capital offense to be eligible for a sentence of death. Ex parte Waldrop, 859 So.2d 1181, 1187 (Ala.2002), citing § 13A-5-45(f), Ala.Code 1975 (providing that when a defendant has been convicted of a capital offense, "[u]nless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole"). Moody argues that because it cannot be determined which, if any, aggravating circumstance in his case was found beyond a reasonable doubt by a unanimous verdict of the jury, he is, based on the Supreme Court's holding in Ring, ineligible for the death penalty. (Moody's supplemental brief at pp. 9-10.) We disagree.
This court has recognized that "[t]he holding in Ring was narrow." Stallworth v. State, 868 So.2d 1128, 1183 (Ala.Crim.App.2001) (opinion on second return to remand). As the Ring Court noted:
"Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence."
536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4.
In Stallworth, this court found that while the Supreme Court in Ring extended Apprendi to death-penalty cases, it did not *598 purport to alter the express exemption in Apprendi for the fact of a prior conviction, which the Supreme Court had earlier recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). We stated:
"[O]ne of the aggravating circumstances in this case related to a prior conviction  that the capital offense was committed by a person under sentence of imprisonment. See § 13A-5-49(1), Ala.Code 1975. The Apprendi Court specifically excluded from its holding prior convictions. The Apprendi Court stated, `Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' 530 U.S. at 490, 120 S.Ct. 2348. The Court left untouched its holding in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), that an increase in a sentence related to recidivism is left to the trial court. As the Maryland Court of Appeals recognized after Apprendi:

"`The rule that prior convictions do not have to be proven to a jury beyond a reasonable doubt was first recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). There, the Supreme Court emphasized that questions related to recidivism have traditionally been decided by the sentencing court rather than the jury. Justice Breyer, delivering the opinion of the Court, wrote:
"`"First, the sentencing factor at issue here  recidivism  is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. Consistent with this tradition, the Court said long ago that a State need not allege a defendant's prior conviction in the indictment or information which alleges the elements of an underlying crime, even though the conviction was necessary to bring the case within the statute. That conclusion follow[s]... from the distinct nature of the issue, and the fact that recidivism does not relate to the commission of the offense, but goes to the punishment only, and therefore ... may be subsequently decided."
"`Id. at 243, 118 S.Ct. at 1230-31, 140 L.Ed.2d 350 (emphasis in original) (internal quotation marks and citations omitted [in Stewart]).
"`In Apprendi, the Court emphasized that it was not overruling Almendarez-Torres. Apprendi, 530 U.S. at 489, 120 S.Ct. at 2362, 147 L.Ed.2d 435. In fact, the Court reiterated that recidivism is a traditional grounds for a sentencing court's increasing an offender's sentence, and that recidivism does not relate to the commission of the offense. Id. at 488, 120 S.Ct. at 2361-62, 147 L.Ed.2d 435 (quoting Jones v. United States, 526 U.S. 227, 248-49, 119 S.Ct. 1215, 1227, 143 L.Ed.2d 311 (1999)).
"`....
"`In United States v. Santiago, 268 F.3d 151 (2nd Cir.2001), the trial judge sentenced the defendant pursuant to a statute that required that the defendant have three prior convictions arising from offenses committed on different occasions. The defendant argued that the "prior conviction" exception does not encompass the question whether prior convictions arose from offenses committed on different occasions. The United States Court of Appeals for the Second Circuit rejected *599 the defendant's argument, reasoning as follows:
"`"In short, we read Apprendi as leaving to the judge, consistent with due process, the task of finding not only the mere fact of previous convictions but other related issues as well. Judges frequently must make factual determinations for sentencing, so it is hardly anomalous to require that they also determine the `who, what, when, and where' of a prior conviction."
"`Id. at 156.
"`Santiago reflects the general rule that the Almendarez-Torres exception covers questions related to recidivism, not merely the fact of prior conviction. Appellee's previous term of incarceration, like prior convictions arising from crimes committed on separate occasions, Santiago, 268 F.3d at 156, or the aggravated nature of a prior conviction, [United States v.] Becerra-Garcia, 28 Fed.Appx. 381, at 385 ... [(6th Cir.2002)], is a fact related to recidivism, and, as stated above, recidivism is a question that traditionally has been reserved for the sentencing court.'
"State v. Stewart, 368 Md. 26, 39-41, 791 A.2d 143, 151-52 (2002). We agree with the rationale and holding of the Stewart court. Whether at the time of the murders Stallworth was under a sentence of imprisonment because he was on probation for his prior conviction for assault in the third degree was a question related to Stallworth's prior conviction  a question for the trial court to resolve. Therefore, this aggravating circumstance was not subject to the holdings in Apprendi and Ring."
Stallworth, 868 So.2d at 1184-85.[54]
Recently, in Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), the Alabama Supreme Court recognized that Ring did not alter the exemption for the fact of a prior conviction; our supreme court stated:
"In his special writing in Bottoson v. Moore, 833 So.2d 693, 719 (Fla.2002), Justice Pariente eloquently explained:
"`[T]he presence of a prior violent felony conviction meets the threshold requirement of Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] as extended to capital sentencing by Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)]. In Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the United States Supreme Court approved an enhanced sentence for the crime of returning to the United States after being deported, based on the judge's finding that the deportation was pursuant to three prior convictions of aggravated felonies. The Court rejected a claim that the enhancement was improper because the indictment had not alleged that the deportation was pursuant to the prior convictions. As explained in Apprendi, "our conclusion in Almendarez-Torres turned heavily upon the *600 fact that the additional sentence to which defendant was subject was `the prior commission of a serious crime.'" 530 U.S. at 488, 120 S.Ct. 2348. In Apprendi, the Court held:
"`"[T]here is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof."
"`Id. at 496, 120 S.Ct. 2348. Accordingly, the Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348 (emphasis supplied [in Bottoson]).
"`In extending Apprendi to capital sentencing, the Court in Ring did not eliminate the "prior conviction" exception arising in Almendarez-Torres. The Court noted in Ring that "[n]o aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres." 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4.'
"833 So.2d at 722-23 (footnote omitted). As was the circumstance in Bottoson, one of the aggravating circumstances presented by the State in the penalty phase of this trial involved a prior felony conviction; therefore, Smith is not entitled to relief pursuant to Ring. See Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)."
Ex parte Smith, ___ So.2d at ___.
In this case, one of the aggravating circumstances found by the trial court was that Moody had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The trial court's finding was based on Moody's prior convictions in federal court for possessing a pipe bomb; transporting explosive material with the intent to kill, causing death; mailing injurious articles with the intent to kill, causing death; attempted murder of federal court personnel; threatening to murder United States judges; multiple counts of mailing threatening communications; and multiple counts of mailing injurious articles with the intent to injure.[55] Because it was a finding of a fact related to recidivism, the trial court's finding, as an aggravating circumstance, that Moody had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, this aggravating circumstance was not subject to the holdings in Apprendi and Ring. Upon the trial court's making this finding, Moody became eligible for a sentence of death.
The trial court also found, as an aggravating circumstance, that Moody knowingly created a great risk of death to many persons, see § 13A-5-49(3). "Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death." Ex parte Waldrop, supra, 859 So.2d at 1190, citing § 13A-5-45(f), Ala.Code 1975. When the trial court found, as an aggravating circumstance, that Moody had been previously convicted of another capital offense *601 or a felony involving the use or threat of violence to the person, Moody became "`exposed' to, or eligible for, the death penalty." Ex parte Waldrop, 859 So.2d at 1190. The trial court's determination that Moody knowingly created a great risk of death to many persons "is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances." Id. at 1190. The trial court's application of this other aggravating circumstance did not violate Apprendi and Ring. See Ex parte Waldrop, 859 So.2d at 1190; Clark v. State, [Ms. CR-99-1062, February 28, 2003[*]] ___ So.2d ___, ___ (Ala.Crim.App.2000) (opinion on return to remand); Stallworth, 868 So.2d at 1173-74; Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002).
Moreover, in Moody's case, the jury did find all facts necessary to impose the death penalty. At the penalty phase of the trial, after the State presented the jury with evidence of the two aggravating circumstances, the trial court instructed the jury as follows:
"The aggravating circumstances which you may consider in this case if you find from the evidence that they may have been proven beyond a reasonable doubt are as follows:
"The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person.
"The defendant knowingly created a great risk of death to many persons.
"Now, as I stated to you before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of an aggravating circumstances considered by you in determining what punishment is to be recommended in this case. This means that before you can even consider recommending that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that at least one or more of the aggravating circumstances exist.

"....
"You may not consider any aggravating circumstance other than the two aggravating circumstances on which I have instructed you. And you may not consider an aggravating circumstance unless you are convinced by the evidence beyond a reasonable doubt of the existence of that aggravating circumstances in this case.

"....
"In order to consider an aggravating circumstance, it is necessary that the jury unanimously agree upon its existence. All twelve jurors must be convinced beyond a reasonable doubt and to a moral certainty that an aggravating circumstance exists in order for any of you to consider that aggravating circumstance in determining what the sentence should be."
(Vol.73, R. 523-30.) (Emphasis added.)[56]
The jury recommended that Moody be sentenced to death, by a vote of 11-1. The fact that the jury's deliberations yielded a vote whether to impose the death penalty  where the jury had been instructed that it could not proceed to a vote unless it *602 first unanimously found the existence of at least one aggravating circumstance  establishes that the jury unanimously found that at least one aggravating circumstance existed. For purposes of Ring, the jury's unanimous finding of at least one aggravating circumstance  regardless of which aggravating circumstance that was  rendered Moody eligible for a sentence of death. In this context, the fact of the jury's vote, rather than the actual vote tally following the jury's weighing process, is the telling circumstance. As the State asserts in its supplemental brief:
"Whether all twelve jurors find that the aggravating circumstances outweigh the mitigating circumstances or only one juror does, it is the vote itself by the jury on the relative weight of these circumstances that makes the trial court aware whether the jury has unanimously found beyond a reasonable doubt that an aggravating circumstance exists."
(State's supplemental brief at pp. 18-19.) Because the jury necessarily found beyond a reasonable doubt and by a unanimous verdict the existence of at least one aggravating circumstance, the requirements of Ring were satisfied in Moody's case.[57]
Moody also argues that Alabama's capital-sentencing scheme is unconstitutional under Ring because it allows the trial judge to make the ultimate determination whether to impose the death penalty. (Moody's supplemental brief at pp. 12-13.) We recently rejected this argument in Tomlin v. State, [Ms. CR-98-2126, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002) (opinion on application for rehearing), where we held:
"The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code 1975  commonly referred to as the judicial override statute  against constitutional attack. In Harris, the United States Supreme Court stated:
"`Alabama's capital sentencing scheme is much like that of Florida. Both require jury participation in the sentencing process but give ultimate sentencing authority to the trial judge. Ala.Code § 13A-5-47(e) (1994); Fla. Stat. § 921.141(3) (1985).... In Florida, as in Alabama, the reviewing courts must independently weigh aggravating and mitigating circumstances to determine the propriety of the death sentence, Ala.Code § 13A-5-53(b)(2) (1994); Harvard v. State, 375 So.2d 833 (Fla. [1977]), cert. denied, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1977) [(1979)], and must decide whether the penalty is excessive or disproportionate compared to similar cases, Ala.Code § 13A-5-53(b)(3) (1994); Williams v. State, 437 So.2d 133 (Fla.1983), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 164.
"`....
"`We have held Florida's capital sentencing statute to be constitutional. See Proffitt v. Florida, [428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)]; Spaziano v. Florida, [468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)]. In Spaziano, we addressed the specific question whether Florida could, consistent with the Constitution, vest sentencing authority in the judge and relegate the jury to an advisory *603 role. While acknowledging that sentencing power resides with the jury in most States, we made clear that the "Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws." Id., at 464 [104 S.Ct. 3154]. We therefore rejected the contention that "placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision." Id., at 465 [104 S.Ct. 3154]; see also Walton v. Arizona, 497 U.S. 639, 648, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).
"`....
"`The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight.'
"513 U.S. at 508-515 [115 S.Ct. 1031]." Tomlin, ___ So.2d at ___. See also Duke v. State, [Ms. CR-98-1218, March 21, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2002) (opinion on return to remand); Clark, ___ So.2d at ___; Turner, ___ So.2d at ___. Moody's claim in this regard is without merit.
We pretermit discussion of Moody's other arguments in his supplemental brief concerning Ring's impact on his sentence of death, because our discussion of the issues above is dispositive of Moody's other claims. Moody's sentence of death does not violate the holding of Ring

XIV.
We affirm Moody's conviction and sentence for first-degree assault as to Helen Vance. Furthermore, in accordance with Rule 45A, Ala. R.App. P., we have examined the record for any plain error with respect to Moody's capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error in the guilt phase of the proceedings.
We have also reviewed Moody's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Moody's capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Moody of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After *604 hearing evidence concerning the aggravating circumstances and the mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 11-1.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Moody to life imprisonment without parole or follow the jury's recommendation and sentence him to death. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense.
In its findings, the trial court found the existence of two statutory aggravating circumstances: (1) that Moody had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975; and (2) that Moody knowingly created a great risk of death to many persons, see § 13A-5-49(3). The trial court did not find the existence of any statutory mitigating circumstances, see § 13A-5-51, Ala.Code 1975. As required by § 13A-5-52, Ala.Code 1975, the trial court considered all aspects of Moody's character or record and any of the circumstances of the offense that might be a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstances. In this regard, the trial court found that the following evidence was mitigating: (1) that Moody had served in the military for three years and had been honorably discharged; (2) that Moody "has some mild mental problems" (Vol.1, C. 60); and (3) that Moody had not been a disciplinary problem while he was incarcerated in the Jefferson County jail pending his trial.
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances in the case, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Moody to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the sentencing phase of the proceedings.
Moody was convicted of one count of murder committed by means of explosives or explosion and one count of murder when the victim is a state or federal public official and the murder stems from or is caused by or is related to the victim's official act or capacity. These offenses are defined by statute as capital offenses. See § 13A-5-40(a)(9) and (11), Ala.Code 1975. Section 13A-5-53(b)(3), Ala.Code 1975, requires that we address whether Moody's sentence was disproportionate or excessive when compared to penalties imposed in similar cases. Moody's sentence was neither. See, e.g., Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997), aff'd, 735 So.2d *605 1270 (Ala.1999); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995); Richardson v. State, 376 So.2d 205 (Ala.Crim.App.1978), aff'd, 376 So.2d 228 (Ala.1979).
After carefully reviewing the record of the guilt phase and the sentencing phase of Moody's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and that death is the appropriate sentence in this case. Considering Moody and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Therefore, Moody's convictions and his sentences are affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] The pipe-bomb packages sent to Robinson and to the Jacksonville office of the NAACP bore false return addresses from Warner Robins, Georgia. The pipe-bomb package sent to the federal courthouse bore a false return address from Atlanta.
[2] Among the other similarities were the following: all of the devices had been packed with paper towels with a goose pattern on them; all had pieces of aluminum pie pans used in them; all had the same size paper clips in them; all had heavy-gauge aluminum wire in them; all had CCI brand pistol primer material in them; and all had the same electrical system in them, with the same color combination of wiring and flashlight bulbs with the bases removed.
[3] The letters were all postmarked on August 21, 1989  the day of the tear-gas bombing  and all had been sent from an Atlanta area post office. None contained a return address.
[4] Gene Wallace's existence has never been documented; from all indications, he was an invention of Moody's mind.
[5] Both Moody and his girlfriend, Susan McBride Samford, coached Linn-West on the story.
[6] In July 1990, Moody was indicted on federal charges of suborning perjury and obstructing justice by procuring the false testimony of Linn-West and Ekstrom. He was convicted of those charges in December 1990, after a trial in Brunswick, Georgia.
[7] Pursuant to an immunity agreement with federal prosecutors, Samford pleaded guilty in 1990 to one count of conspiracy to obstruct justice in connection with her participation in Moody's scheme to procure the false testimony of Julie Linn-West and Jo Ann Ekstrom in the coram nobis proceeding. In exchange for her cooperation with state and federal law-enforcement officials and for her willingness to testify truthfully in court, Samford was not prosecuted on state or federal charges related to her participation in the pipe-bomb killings of Judge Vance and Robert Robinson. The jury was informed of the existence of Samford's deal with prosecutors. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[8] Evidence showed that the death-threat note accompanying the pipe bomb that had been sent to the Jacksonville office of the NAACP in December 1989 was addressed "To the officer who opened our smoke bomb."
[9] All of the judges of the Tenth Judicial Circuit, which is composed of Jefferson County, recused themselves from hearing Moody's case. On April 8, 1992, the Chief Justice of the Alabama Supreme Court assigned Judge William H. Rhea III of the Etowah Circuit Court to preside over Moody's case. See § 6.10, Amend. No. 328, Ala. Const.1901.
[10] Among Moody's complaints was a claim that his attorneys had not spent enough time preparing his case.
[11] For instance, the trial was delayed because Moody failed to obey several orders of the trial court to reveal his expert witnesses to the court and to advise the court of the areas of expertise of those witnesses.
[12] There is no indication in the record that Moody had the financial resources to retain such counsel. We note that while an indigent defendant is entitled to appointed counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. See, e.g., Snell v. State, 723 So.2d 105, 107 (Ala.Crim.App.1998); Briggs v. State, 549 So.2d 155, 160 (Ala.Crim.App.1989).
[13] The hearing was held immediately before an ex parte hearing on Moody's request for the assistance of experts in preparing his defense. The ex parte hearing was held pursuant to an order of the Alabama Supreme Court. See Ex parte Moody, 684 So.2d 114, 122 (Ala.1996).
[14] The record reflects that Moody filed and argued numerous pro se motions in the months leading up to his trial.
[15] Culp informed the trial court that he could serve as "local counsel" if Lewis were admitted to represent Moody; however, he stated that he was not qualified to represent Moody himself because he specialized in civil litigation and had little experience in the practice of criminal law.
[16] Moody suggests in his brief, at p. 9, that the trial court "deprived [him] of his opportunity to exercise his rights under the Batson v. Kentucky [, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),] decision." However, the trial court complied with Rule 18.4(f)(3), Ala. R.Crim. P., by randomly executing the peremptory strikes on Moody's behalf.
[17] The trial court empaneled 18 veniremembers as the trial jury, 6 of whom were the alternate jurors.
[18] Moody was present in court at this time.
[19] Although Matteson did not specify at this time how long of a continuance he was requesting, it is clear from the record that he intended to represent Moody in cooperation with Lewis. Thus, it can be inferred that Matteson was requesting a continuance equal in length to the one requested by Lewis. Matteson never indicated that a continuance of shorter duration would provide him with sufficient time to prepare Moody's defense.
[20] When the trial court asked Moody if he would like to make an opening statement to the jury, Moody responded as follows:

"No, sir. I would like to be represented by counsel. And I would like that counsel to have the opportunity to expose the fabricated evidence and perjured testimony that is being offered, by the State providing him with the resources necessary to retain forensic experts and the time necessary to prepare the trial."
(Vol.63, R. 121-22.)
[21] Moody suggests in his brief, at p. 14, that Lewis and Matteson were willing to serve in a pro bono capacity. However, the record does not clearly establish that as fact. In any event, we must assume in our discussion of this issue that Moody wanted the trial court to appoint Lewis and Matteson as his counsel  because the trial court had found Moody to be indigent earlier in the proceedings, and there is no indication that Moody had sufficient funds to retain the services of an attorney. Moody is represented on appeal by appointed counsel.
[22] Any equivocation expressed by Moody during these pretrial proceedings centered around whether he desired standby counsel and the capacity in which any standby counsel would serve. Ultimately, Moody expressly stated that he did not want standby counsel.
[23] In considering this issue, we find little significance in Moody's filing of a motion requesting Jaffe's reappointment as counsel shortly after Jaffe had been allowed to withdraw. As we have noted, Moody abruptly rescinded the motion for reappointment, stating that he had not resolved his "differences" with Jaffe. Moreover, the record supports the trial court's refusal to reappoint Jaffe on grounds that Moody still had a pending action against Jaffe in federal court and that Jaffe's differences with Moody were irreconcilable.
[24] The record also reflects that Moody had accumulated some credits toward an undergraduate degree and that he had attended law school, where he had completed approximately half of the course work required for a law degree.
[25] In this regard, the trial court fully complied with Rule 6.1(b), Ala. R.Crim. P., which provides, in pertinent part, that "[a]t the time of accepting a defendant's waiver of the right to counsel, the court shall inform the defendant that the waiver may be withdrawn and counsel appointed or retained at any stage of the proceedings."
[26] Rule 6.1(c), Ala. R.Crim. P., provides that a defendant who has withdrawn a waiver of the right to counsel "will not be entitled to repeat any proceeding previously held or waived solely on the grounds of the subsequent appointment or retention of counsel."
[27] Accordingly, we disagree with Moody's statement in his brief that he gained access to the memorandum "just before trial." (Moody's brief at p. 8.)
[28] This court in Russaw also held that reversal of the defendant's conviction was required because the trial court had failed to instruct the jury that in order to convict the defendant of the capital offense of robbery-murder, the jury had to find that the defendant had a particularized intent to kill the victim. 572 So.2d at 1289.
[29] Pursuant to § 15-12-21(e), defense counsel, following completion of the case, is to submit to the trial court a bill for services rendered; upon approval by the trial court, the bill is submitted to the state comptroller for audit and, if approved by the comptroller, is then forwarded to the state treasurer for payment. That procedure remained unchanged by the amendment. In the amendment effective June 10, 1999, well after Moody's trial concluded, the Legislature added a final paragraph to subsection (d) of § 15-12-21, to provide, in pertinent part, that "[p]reapproved expert fees shall be billed at the time the court is notified that all work by the expert has been completed, and shall be paid forthwith." Thus, under § 15-12-21(d) as it now reads, under certain circumstances, fees for experts may be paid before the conclusion of a defendant's trial.
[30] At the time of Moody's trial, § 15-12-21(d) provided as follows:

"Counsel appointed in [indigent] cases ... shall be entitled to receive for their services a fee to be approved by the trial court. The amount of such fee shall be based on the number of hours spent by the attorney in working on such case and shall be computed at the rate of $40.00 per hour for time expended in court and $20.00 per hour for time reasonably expended out of court in the preparation of such case. The total fees to any one attorney in any one case, from the time of appointment through the trial of the case, including motions for new trial, shall not, however, exceed $1,000.00, except as follows: In cases where the original case involves a capital offense or a charge which carries a possible sentence of life without parole, the limits shall be $1,000.00 for out-of-court work, plus payment for all in-court work, said work to be billed at the aforementioned rates. Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court. Retrials of a case shall be considered a new case."
[31] Because of the Supreme Court's finding in this regard, our discussion of the issue is limited to the portion of Moody's claim dealing with the disallowance of advance payments for his experts. We would note that while Moody also argued in the trial court that the payment limitations of § 15-12-21(d) for compensating attorneys who represent indigent defendants in capital cases resulted in there being no competent counsel willing to represent him, Alabama's statutory scheme for compensating court-appointed attorneys in capital cases has repeatedly withstood such constitutional challenges. See, e.g., Ex parte Smith, 698 So.2d 219, 223-24 (Ala.1997); Ex parte Grayson, 479 So.2d 76, 79-80 (Ala.1985); Ferguson v. State, 814 So.2d 925, 967-68 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002); Samra v. State, 771 So.2d 1108, 1112-13 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122 (Ala.2000). On appeal, Moody has not pursued his claim that the payment limitations of § 15-12-21(d) are unconstitutional.
[32] Ake held that when an indigent defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, he is entitled to experts, at the State's expense, who will assist in evaluation, preparation, and presentation of the defense. 470 U.S. at 83, 105 S.Ct. 1087. In Dubose, the Alabama Supreme Court extended the principles of Ake to any expert necessary for an adequate defense.
[33] The Court reasoned that "[r]equiring an indigent defendant to prematurely disclose evidence in a hearing where the state is present encroaches on the privilege against self-incrimination." 684 So.2d at 120. In addition, the Court stated, an open hearing would impair the indigent defendant's right to effective assistance of counsel by disclosing the defense's trial strategy. Id. The Court also stated that requiring an open hearing would result in unequal treatment among defendants, because an indigent defendant would be required to disclose information to the State that a financially secure defendant would not have to disclose. Id.
[34] The Supreme Court also reviewed the trial court's previous appointment of a paralegal to assist Moody and found that the court abused its discretion in making that appointment. At Moody's request, the trial court had appointed the paralegal, at state expense, in October 1994 (two months after Moody's request to proceed pro se was granted); thereafter, she had assisted Moody in preparing his defense. Finding "nothing in the Sixth Amendment right to effective assistance of counsel that includes appointment of a paralegal for an indigent who wants to proceed pro se," 684 So.2d at 122, the Supreme Court held that "Moody is not entitled to a court-appointed paralegal who is paid by the state or a court-appointed paralegal who works on a volunteer basis." 684 So.2d at 123 n. 5. The Supreme Court noted that the paralegal might, however, be entitled to payment for work already done, under the common law theory of quantum meruit. 684 So.2d at 123. On May 8, 1996, in light of the Supreme Court's holding, the trial court dissolved its order appointing the paralegal to assist Moody; she continued to assist Moody without pay.
[35] From the record, it appears that Moody never informed the trial court whether any of the experts in question changed their position regarding prepayment after reading the Whitehurst memorandum.
[36] Again, we recognize that following the 1999 amendment to § 15-12-21, experts may now be paid before the conclusion of a defendant's trial. See note 29, above.
[37] That a criminal statute is constitutionally permissible in the abstract does not necessarily mean that application of the statute in all cases will pass constitutional muster. See State v. Thompson, 349 N.C. 483, 496-97, 508 S.E.2d 277, 285 (1998), quoting United States v. Salerno, 481 U.S. 739, 751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (where the United States Supreme Court held that the pretrial detention procedures under the Bail Reform Act were sufficient to survive a facial constitutional challenge, but recognized that the procedures "`might be insufficient in some particular circumstances'").
[38] The federal district court had appointed 12 experts to assist Moody in his federal trial. None of those experts, however, was called to testify at Moody's federal trial.
[39] Nonetheless, Moody staunchly refused to allow the trial court to appoint counsel for him.
[40] Moody and the prosecution were not allowed to conduct voir dire of prospective jurors while they were assembled as a group. The trial court allowed the parties to conduct individual voir dire of prospective jurors by bringing each prospective juror into its chambers, one at a time.
[41] In an allegation that combined his conspiratorial predilections with his antagonism toward his attorneys, Moody claimed that the $35,000 in supplemental funds that the attorney general had made available to lawyers Turberville and Jaffe when they were representing Moody (see Part IV of this opinion) was actually an illegal "payoff" so that the lawyers would deliberately sabotage Moody's defense and cause Moody to be convicted, thereby advancing the attorney general's political career.
[42] Moody responded to the remarks of the trial court with the following comment: "Your Honor, can I call my attorney to prove that you are a liar?" (Vol.61, R. 674.) An in-chambers conference ensued, during which Moody directed a number of belligerent remarks at the trial court and the prosecutor.
[43] In addition to making the remarks to prospective jurors during the voir dire process, Moody continued to make statements concerning his representation status throughout the trial. On a number of occasions during the proceedings, after the State had conducted direct examination of one of its witnesses, Moody stated, in the presence of the jury, that he wanted to be represented by attorneys David L. Lewis and John Matteson but that he was being unfairly prevented from obtaining their services.
[44] As we indicate in Part XI of this opinion, the trial court, faced with an often difficult pro se defendant, otherwise exhibited remarkable patience throughout the proceedings.
[45] Most of the prospective jurors were of the opinion that the trial should proceed as scheduled. Several prospective jurors, however, answered that they believed a continuance should be granted.
[46] The many similarities in the details of the bombs' composition, in the construction of the boxes that contained the bombs, and in the packaging of the devices are set out in greater detail in Part I of this opinion.
[47] In arguing this issue, Moody does not specifically challenge the introduction of evidence relating to the 1972 pipe bomb. Nor does he challenge the introduction of evidence surrounding a tear-gas bomb that exploded at the NAACP regional office in Atlanta in August 1989. (See Part I of this opinion.) The State's evidence pointed to Moody as the maker and sender of the tear-gas bomb as well.
[48] Moody even concedes that "[t]he fact of Moody's conviction and his relationship, if any, to the bombing devices might be considered relevant." (Moody's brief at pp. 24-25.)
[49] We note that Agent North's testimony regarding Moody's litigation history was not as comprehensive as the testimony on that subject by the investigator for the Alabama attorney general's office who testified at a pretrial hearing on August 2, 1994. That hearing was held on motions to withdraw filed by Moody's appointed counsel and on a motion to proceed pro se filed by Moody. (See Part II of this opinion.) Moreover, Agent North's testimony dealt with Moody's litigation history from 1972 through 1990, while the attorney general's investigator testified concerning Moody's litigation history from 1972 until the August 2, 1994, hearing.
[50] Earlier during its guilt-phase case-in-chief, the State introduced evidence indicating that Judge Morgan had sat on the three-judge appellate panel that, in June 1989, upheld the federal district court's denial of Moody's coram nobis petition attacking his 1972 conviction. See Moody v. United States, 874 F.2d 1575 (11th Cir.1989).
[51] We note that Moody does not specifically challenge the introduction of evidence relating to the letter Wood received.
[52] Although Moody did not offer any evidence to be considered in mitigation, the trial court searched the trial record and the presentence report to determine if any nonstatutory mitigation existed in this case.
[53] On June 24, 2002, while this case was pending on appeal, the United States Supreme Court issued its decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We requested that Moody and the State brief the applicability of Ring to Moody's death sentence. Because Rule 45A, Ala. R.App.App., requires that we search the record for any plain error and because Moody's case was not final at the time Ring was released, we are obligated to consider the impact that Ring has on Moody's case. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
[54] The Supreme Court noted in Apprendi that Almendarez-Torres's recognition of an exemption for the fact of a prior conviction also "turned heavily upon" the "certainty that procedural safeguards attach [ ] to any `fact' of prior conviction." Apprendi, 530 U.S. at 488, 120 S.Ct. 2348. As the Supreme Court stated in Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), a precursor of Apprendi, "one basis" for distinguishing prior convictions is that "a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." 526 U.S. at 249, 119 S.Ct. 1215.
[55] At the sentencing hearing, the State presented exemplified copies of 59 prior convictions for violent felonies.
[*] Note from the reporter of decisions: On June 27, 2003, on application for rehearing and on return to remand, the Court of Criminal Appeals withdrew the February 28, 2003, opinion and issued another one.
[56] The trial court's instructions in this regard were materially identical to those set out in the Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178.
[57] We note that nothing in Ring supports Moody's claim, at p. 11 of his supplemental brief, that the jury's advisory verdict must be unanimous. See Duke v. State, [Ms. CR-98-1218, March 21, 2003] ___ So.2d ___, ___ n. 4 (Ala.Crim.App.2002) (opinion on return to remand).